600 P.2d 873 (1979)
287 Or. 503
STATE of Oregon, Respondent,
v.
William Dean CARTER, Petitioner.
State of Oregon, Respondent,
v.
Marion Clay Dawson, Petitioner.
TC C 76-10-14543; CA 7902; SC 25965; TC C 76-10-14544; CA 7903; SC 25965.
Supreme Court of Oregon, In Banc.[*]
Argued and Submitted February 7, 1979.
Thomas J. Crabtree, Deputy Public Defender, Salem, argued the cause for petitioners. With him on the brief was Gary D. Babcock, Public Defender, Salem.
Walter L. Barrie, Sol. Gen., Salem, argued the cause for respondents. With him on the brief were James A. Redden, Atty. Gen., and John W. Burgess, Asst. Atty. Gen., Salem.
Decided October 2, 1979.
TONGUE, Justice.
The defendants in these consolidated cases were charged by information with criminal activity in drugs (ORS 167.207). Defendant Dawson was also charged with unlawful possession of a weapon (ORS 166.250). Both defendants moved to suppress evidence seized from their automobile at the time of their arrest. The trial judge granted those motions. On appeal by the state, the Court of Appeals remanded the cases to the trial court for further proceedings and, in doing so, announced new rules *874 governing the admissibility of evidence discovered by an officer who has stopped a car for a traffic violation. 34 Or. App. 21, 578 P.2d 790 (1978). We granted review of these cases, together with State v. Tucker, 286 Or. 485, 595 P.2d 1364 (1979), in order to consider some of the problems that arise when a police officer stops a vehicle after observing a traffic violation and, while the vehicle is stopped, discovers evidence of other offenses.
In Tucker we held that an otherwise authorized traffic stop is not rendered invalid simply because the officer is curious or suspicious about the possibility that the vehicle's occupants may be involved in criminal activity. In the present case we consider an additional question: the effect, if any, to be given to circumstances indicating that the officer deliberately kept the vehicle under surveillance before there was any violation at all.

The facts.
Early in the afternoon of October 14, 1976, Officer Miller of the Gresham police force was on routine patrol duty. His patrol took him past a utility installation located in a large field. Earlier that day a Multnomah County sheriff's deputy had told him that there was reason to suspect that two young men responsible for some recent burglaries in Gresham were camping in that field and that the suspects might try to hitchhike out of the area.
As he approached the field in his patrol car, Officer Miller saw a car coming from the opposite direction pull into a driveway there. He "couldn't see who got in, but it appeared like they picked up a hitchhiker." The car then went on its way. Officer Miller turned around and followed it. He testified that his purpose at that time was to observe the occupants of the car as he followed it and, if further investigation then seemed to be called for, to stop it.
Officer Miller testified that he caught up with the car "just before we got to the main core area of the city." Based on what he could see of the occupants, he decided not to stop the car. Shortly thereafter, he said, he noted that the car he was following was going forty miles per hour in an area where the posted speed was thirty miles per hour. Officer Miller did not immediately signal the car to stop because, he testified, there was no good place to pull over in the downtown area. He followed the car for a mile or more before signaling it to pull over. When the car stopped he learned that the occupants were these two defendants, who did not fit the descriptions of the two suspected burglars, and a young woman  the hitchhiker  who went on her way with Officer Miller's permission.
The sequence of events following the stop is not entirely clear. Officer Miller testified that when the car stopped, the driver  defendant Carter  got out of the car and met the officer "near the back of the vehicle." Officer Miller asked him for his driver's license and vehicle registration. Carter produced his license and went back to the car for the registration. He returned with it, meeting Officer Miller near the rear window of the car. At about the same time defendant Dawson, the passenger, got out of the car and came to the same spot. Dawson said that the car belonged to his father; the name on the registration was "A-1 Maintenance Company."
Officer Miller testified that Dawson appeared to be unsteady on his feet, that his eyes were bloodshot and his speech was slurred, although he spoke coherently. Dawson produced his identification at Officer Miller's request. The officer then checked by radio and learned that "both subjects were clear, and Carter's license was current and that the vehicle was not * * * reported stolen * * *."
Continuing his testimony, Officer Miller said that he then walked along the side of the car to a point where he could see inside it, and that he saw a package of cigarette papers on the seat, some vegetable material which he thought was marijuana on the floor, and part of a hand-rolled cigarette in the ashtray. Then, he said, he asked Carter and Dawson if there was anything in the car that shouldn't be there, and they both said "no." He then asked if they objected to his looking inside and they told him to go *875 ahead and look. We quote his testimony as to what happened next:
"* * * I opened the door of the vehicle, and then I turned back around. And I asked them again if there was anything in the vehicle. And then Mr. Dawson said he had a quantity of marijuana in there, but it was less than an ounce. And I asked him to take it out. And at that time he turned around, and I was standing behind him. He squatted down, and it appeared as though he reached under the front seat of the vehicle. He removed a small, clear plastic sandwich baggie containing a green substance which looked like marijuana. * * Then I asked him if there was anything else in the vehicle, and he said there was a gun. * * * I asked him where it was and if it was loaded. He said, `Yeah, I think it is loaded.' He said, `It is under the front seat.' So then I reached in underneath the front seat and removed the gun and placed it on top of the car."
Other officers then arrived at the scene. A large quantity of marijuana was found in the back seat and trunk of the car. The details of the search that disclosed it are not important, as the defendants concede that a search of the car was justified if the preceding conduct by the officer was proper.
The defendants were arrested. Carter was cited for violation of the basic rule. Both defendants were charged with criminal activity in drugs. Dawson was also charged with unlawful possession of a weapon.
Officer Miller's written report was admitted into evidence at the suppression hearing. Although not as detailed as his testimony, it is consistent with what we have related above except in one particular. The report states that Officer Miller looked into the car and saw the cigarette papers, hand-rolled cigarette, and what appeared to be marijuana debris after, rather than before, he had asked the defendants about the contents of the car and asked for permission to look inside. The sequence described in the written report is the same as that described by Officer Miller at the preliminary hearing, a tape recording of which was introduced for impeachment purposes.

The stop after an observed traffic violation was proper.
In State v. Tucker we discussed the authority of a police officer to stop a vehicle when its operator has committed a traffic violation in his presence. What we said there would dispose of the question of the propriety of the stop in this case were it not for one additional fact. The officer, having noticed the automobile apparently picking up one or more hitchhikers in an area where he had been told two burglary suspects might be trying to hitchhike, followed the vehicle for some distance  approximately two miles as we interpret the testimony  before he saw the traffic violation which provided the basis for the stop. He testified that while he was following the car and before he observed the speeding violation, he had seen that there was only one passenger in the back seat. As a consequence, he testified, he had decided not to stop the car to check the hitchhiker in connection with the burglaries, but later decided to stop the car because it exceeded the speed limit.
The trial judge apparently did not believe this testimony. He stated, as a basis for his ruling suppressing the evidence, that "[i]n listening to him I couldn't help but feel that he stopped the car, not because they were going ten miles over the thirty mile an hour speed limit, but for other reasons." There was evidence to support this finding.
The officer's motives for an otherwise justifiable traffic stop are, as we held in Tucker, not relevant to the question of its validity. The question remains whether a policeman who wants to get a closer look at a car or its occupants may follow it and, if the driver commits a traffic violation while the officer is following, may then stop it. We conclude that under normal circumstances he may.
Defendants have not suggested any grounds, and we are not aware of any, for holding that a police officer may not keep persons of whom he is suspicious under *876 surveillance in public places, whatever the reasons for his suspicion. See generally LaFave, Search and Seizure § 2.7 at 432-435. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the United States Supreme Court first announced the constitutional rules limiting the right of the police to stop and frisk in the absence of probable cause, the statement of facts discloses that the officer first noticed two persons behaving somewhat oddly on the street, then watched them for a considerable period of time. Their behavior during that period of observation provided the reasonable grounds for suspicion which, the court held, justified the stop and accompanying frisk. There is no suggestion in the court's opinion that the officer, by keeping the two men under observation, was engaged in anything other than proper police work. Officer Miller thus had a right to be where he was when he observed the speeding violation. Because Officer Miller's continued observation of the car in which defendants were riding was proper under the circumstances, there are no grounds for holding that when he saw the car's operator commit a traffic violation he could do nothing about it. Having seen the violation, he was authorized, as we held in Tucker, to require the car to stop.

The motion to suppress was properly granted.
The Court of Appeals, having concluded  as we have  that the initial stop was valid, went on to consider the intrusiveness of the officer's subsequent behavior. That court said, based upon its analysis of both statutory and constitutional law, that the officer's behavior, for purposes of the exclusionary rule, was to be tested according to the following standard:
"* * * Traffic stops should be the minimum possible intrusion on Oregon motorists, and not an excuse to begin questioning, searching or investigating that is unrelated to the traffic reason for the stop." 34 Or. App. at 32, 578 P.2d at 796.
The Court of Appeals then determined that there was conflicting evidence which was crucial to the application of this standard:
"* * * One possibility  supported by part of Officer Miller's testimony at the suppression hearing  is that he made a plain-view observation of marihuana (sic) in the course of stopping defendants for speeding, or requesting drivers' licenses and registration, or while making inquiry relating to the speeding infraction. If these are the facts, Officer Miller was authorized to inquire and search further. The other possibility  supported by Officer Miller's written report  is that after the `records check' came back `clear,' he began a series of inquiries that were not related to the traffic infraction: `Do you have anything in the car that shouldn't be there? Can I look into the car?' If these are the facts, and it was only after this irrelevant questioning that Officer Miller observed marihuana (sic), his observation was tainted by the unreasonable intrusiveness of the stop.
"Simply stated, when the `records check' came back `clear,' Officer Miller could do no more than write a citation and send defendants on their way. He could not begin questioning or an investigation that had nothing to do with the objective reason for the stop (speeding). If he did so, the officer extended the duration of the stop without legally sufficient articulated cause." 34 Or. App. at 32-33, 578 P.2d at 796-97.
The Court of Appeals concluded that the case must be remanded for findings of fact on this issue. Our own examination of the record, however, convinces us that the necessary finding on this question was in fact made. The trial judge ordered the evidence suppressed based on his finding that the officer's purpose in making the initial stop was not simply to issue a citation for speeding, a finding which our analysis renders irrelevant. He went on, however, to make the following additional finding:
"* * * There is some contradiction between the officer's testimony as to whether he first went up to the car or whether he first asked them those questions. *877 I think I would find that he asked them the questions first and then went up to the car."
The finding of fact by the trial court is the kind of determination of historical fact which we have said will be binding upon an appellate court when it is reviewing constitutional questions of the kind determined by the Court of Appeals in this case. See State v. Warner, 284 Or. 147, 157-58, 585 P.2d 681 (1978); Ball v. Gladden, 250 Or. 485, 443 P.2d 621 (1968).
In view of this factual finding by the trial court, there are no grounds for holding that Officer Miller had probable cause to search based on his plain view observation of the suspicious items. Upon these facts, the only arguable justifications for the search resulted from Officer Miller's inquiries.
When this case was originally argued in this court, counsel for both parties addressed themselves to the question of the intrusiveness of the officer's behavior in addition to that of the justification for the initial stop. Counsel for the state also argued that if the stop was proper, the ensuing search was permissible because it was made with the defendants' consent. We became concerned about certain aspects of these issues and asked the parties, by letter dated July 9, 1979, to address our concerns in reargument of the case. Both parties to that request have responded with letters to the court to the effect that the only issue before us is the validity of the stop itself. That was, indeed, the only issue directly raised by the defendants' petition for review. The state did not file a petition. In view of the parties' agreement that no other issues are before us, we have concluded that no reargument is necessary.
Because the Court of Appeals held that the officer's inquiries were improper if they preceded his observation of the suspicious items, and because that portion of the Court of Appeals' decision has not, as the parties agree, been challenged in this court, the granting of the motion to suppress should have been affirmed. Although we have held that the trial court's reason for granting the motion was in error, the result, under the facts as found by the trial court and the rule adopted by the Court of Appeals, was correct.
The trial court's order suppressing the evidence is affirmed, and the case is remanded for further proceedings.
NOTES
[*] HOLMAN, J., did not participate in this decision.