Argued and submitted November 1, decision of the Court of Appeals reversed,
judgment of the circuit court affirmed December 30, 1993

STATE OF OREGON,
*Petitioner on Review,*

*v.*

RANDALL BEA,
*Respondent on Review.*

(CC C88-07-35096; CA A61547; SC S39611)

864 P2d 854

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition were Charles S. Crookham, Attorney General, and Virginia L. Linder, Salem, and with him on the reply brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Jesse Wm. Barton, Deputy Public Defender, Salem, argued the cause for respondent on review. With him on the response was Sally L. Avera, Public Defender, Salem.

GRABER, J.

## GRABER, J.

Defendant was charged with failure to carry or present a driver's license, ORS 807.570, and unlawful possession of a controlled substance, ORS 475.992. Before trial, he moved to suppress "any and all evidence resulting from the stop and search of defendant," on the ground that he was unlawfully stopped and searched, in violation of applicable statutes and the Constitutions of Oregon and the United States. The trial court denied defendant's motion. After a trial on stipulated facts, the court found defendant guilty of both charges. Defendant appealed. The Court of Appeals reversed and remanded the case for a new trial. *State v. Bea*, 107 Or App 118, 810 P2d 1328 (1991). We allowed the state's petition for review and now reverse the decision of the Court of Appeals and affirm the judgment of the circuit court.

We summarize the facts from uncontradicted testimony. A Portland police officer and his partner saw defendant park around the corner from, and approach, a house in Portland. The officer knew that Portland police had searched the house, pursuant to search warrants, twice in the previous week. The officer did not know whether drugs had been found in the house on those occasions. The officer watched defendant walk onto the porch of the house and remain there for "a couple of minutes." Defendant then returned to his car and drove away.

The officer followed defendant's vehicle in his police car. Defendant drove north on Kerby Avenue. After several blocks, he came to an L-shaped intersection of Kerby Avenue and Sumner Street. Kerby terminated at its intersection with Sumner. There was no stop sign at the intersection. Defendant went left from Kerby onto Sumner, the only direction in which he could have continued to travel on a public street unless he reversed direction on Kerby. Defendant did not signal when going left.

The police officer stopped defendant for turning without signaling.[1] He approached defendant's vehicle and asked defendant for his driver's license. Defendant replied that he did not have it with him. The officer asked defendant

---

[1] *See* ORS 811.335 (unsignaled turn) and ORS 811.400 (failure to signal), which are quoted and discussed in the text below.

to step out of his car. After defendant did so, the officer advised defendant that he was under arrest for failure to display his driver's license; he handcuffed defendant and advised him of his rights under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Defendant responded that he understood his rights.

The officer then asked defendant whether he had a driver's license and whether it was valid. Defendant responded in the affirmative. The officer told defendant that the officer had "seen him go up to the known drug house" and asked defendant whether he had "just bought some crack cocaine there" and whether he "had any weapons or drugs on him." Defendant answered "no" to both questions. Finally, the officer asked defendant "if he'd mind if I checked him for drugs or weapons." Defendant answered, "No, go ahead." On searching defendant's pockets, the officer found a glass pipe containing cocaine residue and a clear plastic bag containing cocaine.

At trial, defendant moved to suppress the evidence of his failure to present a driver's license and the evidence of the cocaine. The trial court denied the motion. Defendant was tried to the court on stipulated facts and was convicted of failure to present a driver's license and unlawful possession of a controlled substance.

Defendant appealed, arguing that the trial court erred in denying his motion to suppress. Defendant argued that the stop was unlawful because, in going left without signaling at the L-shaped intersection of Kerby and Sumner, he did not commit a traffic infraction and because the police officer who arrested him lacked reasonable suspicion to believe that he had committed any other crime. Defendant also argued that the search of his person was unlawful, because "the circumstances of the stop and arrest were so coercive" that his consent to the search was not voluntary.

The Court of Appeals concluded that ORS 811.400(1),[2] relating to signaling when "turning," did not apply to what defendant did because, when defendant went left from Kerby onto Sumner, he "did not deviate from his

---

[2] The text of ORS 811.400(1) is set out at p 225, below.

presumed course" of travel. *State v. Bea, supra,* 107 Or App at 120-21. The court next noted that, although search warrants had been executed at the house defendant visited, the police officer did not know the outcome of those searches. The court concluded that, in that circumstance, the officer's observation of defendant's visit to the porch of that house was not sufficient to give rise to a reasonable suspicion that defendant had committed a crime. *Id.* at 121-22. The court held that the stop of defendant thus was not lawful on either of the grounds advanced by the state. *Ibid.* The court also held that defendant did not consent to the search after the unlawful stop, because "[n]o intervening events occurred between the stop and arrest and the submission to the search" and that defendant's consent therefore was "tainted by the prior illegality." *Id.* at 122. The Court of Appeals reversed defendant's convictions and remanded the case to the circuit court for a new trial. *Ibid.* The state petitioned this court for review, and we allowed the petition.

■ On review, the state concedes that defendant was stopped unlawfully. We need not accept that concession concerning a legal conclusion, however, and in this case decline to do so.[3] *See Marnon v. Vaughan Motor Co., Inc.,* 184 Or 103, 133, 194 P2d 992 (1948) (Supreme Court declined to accept party's concession concerning a legal conclusion). Accordingly, we first consider the question whether defendant's action in going left, without signaling, at the L-shaped intersection of Kerby and Sumner constituted a traffic infraction, the commission of which authorized the officer to stop defendant. *See* ORS 810.410(3) (a police officer may "stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic infraction, identification and issuance of citation").

We begin by noting that, during the proceedings in the trial court, neither defendant nor the state expressly identified ORS 811.400, set out below, as the statute that defendant allegedly violated when he went left without signaling. Instead, the trial court identified that provision as the applicable one. On appeal, defendant and the state argued about the meaning of ORS 811.400(1), and the Court of

---

[3] At trial and on appeal, the state argued that the stop was lawful. For the reasons discussed below, we agree with the state's earlier position.

Appeals construed that section in concluding that the stop of defendant was unlawful. We believe that, in considering whether defendant's action in driving left, without signaling, from Kerby onto Sumner constituted a traffic infraction, an equally relevant statute is ORS 811.335, also set out below. Accordingly, we consider the interpretation of both of those statutes.

 In interpreting a statute, our task is to determine the intent of the legislature. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We begin with the text and context of the statute. *Ibid.* The text is the best indication of the legislature's intention. *Ibid.* In determining the meaning of the text of a statute, words of common usage that are not defined in the statute should be given their plain, natural, and ordinary meaning. *Id.* at 611. The context of a statute includes other provisions of the same statute and related statutes on the same subject. *Ibid.* Where the legislature uses the same term throughout a statute, the court infers that the term has the same meaning throughout the statute. *Ibid.* Where a statute contains several provisions, a construction is to be adopted, if possible, that will give effect to all. ORS 174.010; *PGE v. Bureau of Labor and Industries, supra*, 317 Or at 611.

ORS 811.335 provides in part:

"(1) A person commits the offense of making an unlawful or unsignaled turn if the person is operating a vehicle upon a highway and the person turns the vehicle right or left when:

"* * * * *

"(b) The person fails to give an appropriate signal continuously during not less than the last 100 feet traveled by the vehicle before turning.

"* * * * *

"(3) The offense described in this section, making an unlawful or unsignaled turn, is a Class C traffic infraction."

ORS 811.400 provides in part:

"(1) A person commits the offense of failure to use an appropriate signal for a turn, lane change or stop if the person is operating a vehicle that is turning, changing lanes, stopping or suddenly decelerating and the person does not

make the appropriate signal under ORS 811.395 [describing hand signals and signal lights] * * *.

"* * * * *

"(3) The offense described in this section, failure to use appropriate signal for turn, lane change or stop, is a Class C traffic infraction."

Neither the text of ORS 811.335, nor the text of ORS 811.400, defines what type of driving maneuver constitutes a "turn" within the meaning of those provisions. Neither does the Oregon Vehicle Code, ORS chapters 801 to 822, define that term in its definition section, ORS 801.100 to 801.610.

The ordinary meaning of the noun "turn" is "the action or an act of * * * taking a direction or a different direction: change of course"; "the action or an act of turning aside (as from a straight course)." The verb "to turn" ordinarily means "to cause to * * * take another path or direction"; "to change the direction of"; "to cause to go or move in a particular direction"; "to direct one's course"; "to change one's course: take a different course or direction." Webster's Third New International Dictionary (unabridged) 2466-67 (1976). Those general definitions suggest, although they do not establish conclusively, that a "turn" includes the action that occurs when a vehicle changes its direction of travel and changes from one course of travel to another, whether or not the driver had the option of not changing direction or course.

Other provisions of chapter 811 of the Oregon Vehicle Code — the "Rules of the Road for Drivers" — provide a context that further assists us in determining what the legislature intended in using the word "turn" in ORS 811.335 and 811.400. ORS 811.340 describes the proper method of making a left turn:

"(1) A person commits the offense of making an improperly executed left turn if the person operates a vehicle and is intending to turn the vehicle to the left and the person does not:

"(a) Approach the turn in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of the turning vehicle;

"(b) Make the left turn to the left of the center of *the intersection* whenever practicable; and

"(c) Leave *the intersection or other location* in the extreme left-hand lane lawfully available to traffic moving in the same direction as such vehicle on the roadway being entered.

"(2) The offense described in this section, improperly executing a left turn, is a Class A traffic infraction." (Emphasis added.)

The term "intersection" is defined to include "the area of a roadway created when two or more roadways join together at any angle." ORS 801.320. "Roadway" and "highway" also are defined terms:

" 'Roadway' means the portion of a highway that is improved, designed or ordinarily used for vehicular travel, exclusive of the shoulder. In the event a highway includes two or more separate roadways the term 'roadway' shall refer to any such roadway separately, but not to all such roadways collectively." ORS 801.450.

" 'Highway' means every public way, road, street, thoroughfare and place, including bridges, viaducts and other structures within the boundaries of this state, open, used or intended for use of the general public for vehicles or vehicular traffic as a matter of right." ORS 801.305.

Considered together, and incorporating the ordinary meaning of the word "turn," those provisions suggest that a "turn" includes the action that occurs when a vehicle arrives at the juncture of two streets, changes its direction of travel, and changes from one course of travel (*i.e.*, street) to another.

Additional provisions of ORS chapter 811 further assist us because, in describing requirements related to "turns," they provide no exception to those requirements based on the overall pattern of the streets involved or the number of directional options available to a driver. *See, e.g.,* ORS 811.345 (providing for the offense of "failure to use special left turn lane" when such a lane is indicated by a traffic control device and a person "turns the vehicle left from any other lane"); ORS 811.350 (providing for the offense of "dangerous left turn" when a person operating a vehicle "intends to turn" left within an intersection or into an alley, private road, driveway or "place" from a highway and the person fails to yield the right of way to certain vehicles

approaching from the opposite direction); ORS 811.355 (providing for the offense of making an improperly executed right turn if a person operating a vehicle does not proceed as close as practicable to the right-hand curb or edge of the roadway); ORS 811.360 (permitting turns at red lights, including right turns into two-way streets and right or left turns into one-way streets "in the direction of traffic upon the one-way street"; also providing for the offense of "improper turn at a stop light" where a person turns at a red light but, for example, fails to yield to other traffic within the intersection or fails to yield to pedestrians). As particularly relevant here, none of those provisions distinguishes between "turns" made by choice and "turns" made because they constitute a driver's only available option of continuing forward on public streets.

Considering the foregoing text and context, it appears that, in establishing requirements for the signaling of turns, the legislature intended to include the type of maneuver made by defendant in this case. Giving the word "turn" its plain, natural, and ordinary meaning; giving it the same meaning throughout the Oregon Vehicle Code; and giving effect both to the signaling provisions and to other, related provisions of the Oregon Vehicle Code, those signaling provisions, ORS 811.335 and 811.400, appear to apply to a change in direction of travel made from one street to another at the intersection of two or more streets. Because defendant committed a traffic infraction when he turned left, without signaling, at the L-shaped intersection of Kerby and Sumner,[4] the police officer was authorized to stop defendant under ORS 810.410(3). That is, the stop of defendant was lawful.[5]

After the officer lawfully stopped defendant, the officer was authorized to request that defendant present his driver's license. See ORS 807.570(1)(b)(A) (providing for the offense of failure to carry or present a license when requested

---

[4] We need not and do not decide what other maneuvers are "turns" within the meaning of ORS 800.335 and 811.400.

[5] Defendant contends that the officer's stop of defendant for turning without signaling was a "pretext" stop. Defendant himself correctly recognizes, however, that an "officer's motives for an otherwise justifiable traffic stop are * * * not relevant to the question of its validity." State v. Carter/Dawson, 287 Or 479, 485, 600 P2d 873 (1979).

to do so by a police officer upon being lawfully stopped or detained when driving a vehicle; ORS 807.570 is a Class C misdemeanor). In addition, when defendant failed to present his driver's license, the officer was authorized to arrest him. *See* ORS 161.615 (providing for a maximum term of imprisonment for a Class C misdemeanor of 30 days); ORS 801.545 (defining "traffic crime" as "any traffic offense that is punishable by a jail sentence"); ORS 810.410(1) (providing that a police officer may arrest a person for a "traffic crime").

Having determined that the stop and arrest of defendant were lawful, we next consider whether defendant voluntarily consented to the search of his person. We begin by considering whether defendant's consent to search was voluntary under Article I, section 9, of the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers state constitutional claim before considering federal constitutional claim). Article I, section 9, provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched and the person or thing to be seized."

In *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992), this court explained:

> "Normally, in order for a search to be constitutionally permissible, the police must have a search warrant. *State v. Campbell*, 306 Or 157, 163, 759 P2d 1040 (1988). In the present case, the police did not have a search warrant when they entered [the] defendants' apartment. The evidence, however, is not to be suppressed automatically on that ground. Evidence is not suppressed unless the search was 'unreasonable' under Article I, section 9, of the Oregon Constitution.

> "A warrantless search by the police is 'reasonable' under Article I, section 9, when the search falls within one or another of the recognized exceptions to the warrant requirement. *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986). One such exception is *consent*. 'When there is consent to a search, no warrant is necessary.' *State v. Pogue*, 243 Or 163, 164, 412 P2d 28 (1966). Under the consent exception to the warrant requirement, the state

must prove by a preponderance of the evidence that someone having the authority to do so voluntarily gave the police consent to search the defendant's person or property. *State v. Stevens*, 311 Or 119, 136-37, 806 P2d 92 (1991)." (Emphasis in original; some citations omitted.)

■ In the present case, the trial court found as fact, "in accordance with" the officer's testimony, that defendant consented to the search of his person. In reviewing the voluntariness of a defendant's consent to search, this court will not disturb the trial court's findings of historical fact if evidence supports them; this court is not, however, bound by the trial court's ultimate holding as to voluntariness, but "assesses anew whether the facts suffice to meet constitutional standards." *State v. Stevens, supra*, 311 Or at 135; *see also State v. Warner*, 284 Or 147, 158, 585 P2d 681 (1978) (whether findings of historical fact made by the trial court are sufficient to support the trial court's conclusion that a person voluntarily consented to a search is a question of law for the appellate courts).

We summarize the circumstances under which the police obtained defendant's consent in this case. Defendant was confronted by two uniformed officers during daylight hours on a public street. No weapons were displayed during the encounter, and the record discloses no use of physical force against defendant. Although defendant was arrested and handcuffed by one of the officers, he was not transported to the station house before he gave his consent.

■ We conclude that those circumstances, in their totality, support the trial court's conclusion that defendant voluntarily consented to the search of his person. There is nothing in the record to indicate that the police "intimidated or coerced [defendant] in any way" in obtaining his consent or that there were any circumstances present that might "impair [defendant's] capacity to make a knowing, voluntary, and intelligent choice." *See State v. Stevens, supra*, 311 Or at 135-36 (using those factors in holding that there was evidence to support the trial court's conclusion that a defendant voluntarily consented to a search within the requirements of Article I, section 9); *see also State v. Quinn*, 290 Or 383, 394, 623 P2d 630 (1981) ("the fact of lawful custody does not render involuntary an otherwise voluntary consent to search").

Because defendant voluntarily consented to the search, that search did not violate defendant's rights under Article I, section 9.

Neither did the search violate defendant's rights under the Fourth Amendment to the Constitution of the United States. The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[6]

Under the Fourth Amendment,

> "a search conducted without a warrant issued upon probable cause is *'per se* unreasonable * * * subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States*, 389 US 347, 357, [88 S Ct 507, 19 L Ed 2d 576 (1968)]. It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."

*Schneckloth v. Bustamonte*, 412 US 218, 219, 93 S Ct 2041, 36 L Ed 2d 854 (1973) (some citations omitted). The state has the burden of proving that

> "the consent was in fact voluntarily given, and [was] not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances * * *." *Id.* at 248.

Although the suspect in *Schneckloth v. Bustamonte, supra,* was not in custody, the Supreme Court of the United States later made clear that the *Schneckloth* test also applies to a consent given after a lawful arrest. The mere fact that a defendant is in custody of police officers does not, in itself, demonstrate that a consent to search is coerced. *See United States v. Watson*, 423 US 411, 424, 96 S Ct 820, 46 L Ed 2d 598 (1976) (citing *Schneckloth* in concluding that "the fact of

---

[6] The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081 (1961).

custody alone has never been enough in itself to demonstrate a coerced * * * consent to search").

We conclude that, considering the totality of the circumstances, defendant's consent was "voluntarily given, and [was] not the result of duress or coercion." *See Schneckloth v. Bustamonte, supra,* 412 US at 248 (stating the quoted standard). *See also State v. Flores,* 280 Or 273, 277-79, 570 P2d 965 (1977) (concluding that, where the defendant was arrested but the police did not use force or threat of force, made no promises, and used no other form of coercion, the defendant's consent to search was voluntary and the consented-to search did not violate the Fourth Amendment); 1 LaFave and Israel, Criminal Procedure 343 (1984) (in applying the test established in *Schneckloth v. Bustamonte, supra,* circumstances to be considered include whether the person "was confronted with many police officers or a display of weapons," as well as whether the person "was in custody and if so whether the circumstances of the custody were coercive" (footnotes omitted)); 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment 182-84 (2d ed 1987) (citing *United States v. Watson, supra,* and stating that circumstances of an arrest that are relevant to the validity of a consent to search following the arrest include the time of day at which the arrest occurred, whether it was made with a display of weaponry, whether it was made by way of a forcible entry or by use of force against the person, whether the arrestee was placed in handcuffs or otherwise placed in close restraint after the arrest, and whether the arrest "was used as leverage, in the sense that the arrestee was told he would be released if he gave consent"; of "greatest significance" is whether the arrestee was "subjected to interrogation in a stationhouse atmosphere"). Because defendant voluntarily consented to a search of his person, that search did not violate defendant's rights under the Fourth Amendment to the Constitution of the United States.

In summary, because the police officer reasonably suspected that defendant had committed a traffic infraction, the stop of defendant was lawful. The officer also lawfully arrested defendant for the traffic crime of failure to present a driver's license. Because defendant then voluntarily consented to a search of his person, that search did not violate

defendant's rights under Article I, section 9, of the Oregon Constitution, or the Fourth Amendment to the Constitution of the United States. The trial court did not err in denying defendant's motion to suppress evidence resulting from the stop and search.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.