Argued and submitted September 10, 2008, affirmed April 15, petition for review denied July 9, 2009 (346 Or 363)

In the Matter of the Marriage of

Linda J. McLAUCHLAN,
*Petitioner-Respondent,*

*and*

Charles L. McLAUCHLAN,
*Respondent-Appellant.*

Jackson County Circuit Court
024294D3; A134002

206 P3d 622

George W. Kelly argued the cause for appellant. On the brief were Inge D. Wells and Wells & Wells.

Douglas J. Richmond argued the cause for respondent. With him on the brief was Kellington, Krack, Richmond, Blackburst & Glatte, LLP.

Before Armstrong, Presiding Judge, and Haselton, Judge, and Rosenblum, Judge.*

ROSENBLUM, J.

---

* Haselton, J., *vice* Brewer, C. J.

**ROSENBLUM, J.**

In this appeal from a judgment of dissolution of marriage and a supplemental judgment, husband challenges the trial court's property distribution and its award of spousal support to wife. In particular, husband asserts that the court erred in (1) entering a supplemental judgment incorporating wife's proposed plan for refinancing the parties' real property (the Butte Falls property or the property) to pay husband his share of the equity in the Butte Falls property; (2) valuing the Butte Falls property at $296,520 and awarding it to wife, rather than ordering it sold and the net proceeds equitably divided; and (3) ordering husband to pay wife maintenance spousal support and in reducing that support obligation to a "lump sum present value." On *de novo* review, ORS 19.415(3), we affirm in all respects.

## I.   FACTUAL BACKGROUND

We begin with an overview of the facts, but supplement those facts in more detail as necessary in the context of the relevant assignments of error.

Husband and wife met in 1975 and lived together in Poway, California, until July 1978. Wife worked in a retail clothing store and husband was a part-time brand inspector. In 1978, wife moved to Oregon with husband's mother. Husband remained in California to help develop ranch property that he had received from his family in 1975 (the Poway property). Wife took care of husband's mother and earned money selling firewood from the property in Oregon where they were living. Husband visited and occasionally sent wife money.

In July 1982, a month before the birth of their second child, the parties married. They signed a prenuptial agreement expressing their intent to retain their respective separate property rights in the property they each owned at the time.[1] The agreement also stated that either spouse could make additional gifts to the other and that such gifts would become the separate property of the receiving spouse. After

---

[1] Husband's separate real property included the Poway property; wife's included a duplex in Medford.

their marriage, husband continued to live in California and work on developing the Poway property. The parties eventually had a total of six children together, two of whom were minors (ages 11 and 16) at the time of trial.

In 1987, wife moved to the Butte Falls property with the children and her mother-in-law. The Butte Falls property, which consisted of five separate tax lots totaling approximately 117 acres, was purchased for $100,000 cash and titled solely in wife's name. According to wife, the money to purchase the property came from refinancing the Poway property. Husband testified that he had the Butte Falls property titled in wife's name alone because he wanted to protect it from attachment by his creditors; wife testified that it was put in her name "in case anything happened to him, that the kids and I would have some place to live." Wife and the parties' two minor children were living on the Butte Falls property at the time of trial.

From 1987 until 1995, when wife started working as a school bus driver, wife sold firewood from the Butte Falls property for income. Wife then worked part time as a school bus driver from 1995 until 2003. She accumulated a small retirement (PERS) account during that employment. In 2002, she obtained her real estate license and, in 2003, began working as a commission-based real estate agent.

Meanwhile, during much of this time, husband was still living in California and working on developing the Poway property. In 1990, he entered into a partnership in connection with that property; his partner apparently loaned the partnership over $2 million to pay off debt on the Poway property. In 1992, husband's partner filed suit against both husband and wife, and the partnership was dissolved. Kauffman, the attorney who represented husband and wife in that litigation, eventually obtained separate judgments against each of them for unpaid legal fees.

In late 1996, after losing the last of the Poway property, husband moved to Oregon and lived with the family on the Butte Falls property. He worked as a school bus driver and also sold cars for a period. In 2002, he, too, obtained a real estate license, and he began selling real estate that year.

## II. TRIAL COURT PROCEEDINGS

Wife filed a petition for dissolution in December 2002. In October 2004, after Kauffman obtained a judgment lien on the Butte Falls property and began foreclosure proceedings, wife filed a voluntary petition for bankruptcy under 11 USC section 362 (chapter 13).[2] That action was pending in federal bankruptcy court when the trial began on October 28, 2005; some documents related to it were admitted into evidence as wife's exhibit 7. The parties' assets at the time of trial consisted of the Butte Falls property (subject to various encumbrances); an array of vehicles, farm equipment, and other personal property; and wife's PERS account (which contained a balance of less than $8,000).

In her trial memorandum and at trial, wife argued that the Butte Falls property was a gift and, thus, under the parties' prenuptial agreement, should be awarded to her as her separate property. Husband's position was that the Butte Falls property was a marital asset; he proposed that it be sold and the proceeds be divided between them in accordance with a plan that he submitted with his trial memorandum. At trial, he expressed concern that, if he were awarded an equalizing money judgment instead, that judgment could be discharged in wife's bankruptcy.

After wife and husband had each presented their case, the following colloquy occurred:

"THE COURT:  Has the Bankruptcy Court put a value on the Butte Falls property? Has anyone put a value on the—

---

[2] Wife's bankruptcy attorney testified that, although wife's filing triggered the automatic stay provisions of the federal bankruptcy code and stayed the forced sale of the Butte Falls property, the bankruptcy court subsequently granted modified relief from that automatic stay "recognizing [the state court's] authority to determine the property matter especially regarding [wife's] ownership of [the Butte Falls property], so that [wife] could have [ownership] determined by State law[.]" Wife then filed a proposed plan in connection with her bankruptcy petition whereby, once her ownership of the property was determined through the dissolution action, she would sell one parcel of the property to pay off Kauffman's judgment and her other creditors. When she failed to obtain an ownership determination within the time specified in the plan, she filed an adversary proceeding against husband to "sell the property free and clear." That proceeding was apparently pending in bankruptcy court when the trial in this case began.

"* * * * *

"[Wife's counsel]:   —[N]o recent appraisal.

"* * * * *

"THE COURT:   I would think if you wanted to hold on to it, you'd want me to know what it's worth, right?

"[Wife's counsel]:   Well, only if it was totally going to her. But obviously if it's going to—the reality of it, Your Honor, is that * * * she recognizes that the Court determines it to be a marital asset. The only choice is to sell it, I think with the way things are.

"[Husband's counsel]:   And in all fairness to Counsel, there is some value assigned to it. It's in the bankruptcy documents, which have been admitted into evidence and including of which should be—or maybe it isn't. But there was a value assigned by Petitioner in her bankruptcy concerning this asset. And it should be in the bankruptcy documents they have submitted. And if I can find it I will notify you where it's located."

After some further discussion, the court noted that a schedule included with those documents, which had been admitted as wife's exhibit 7, indicated that the value of the Butte Falls property was "almost $300,000." Wife agreed that "[t]hat would be the right number," but added, "[t]hat is a very, very, very low estimate" as to the Butte Falls property's value as of a year before trial. Husband did not object to the court's use of that estimate, nor did he request to offer his own evidence on that issue.

At the end of trial, the court told the parties that it planned to set out a proposed judgment in a letter opinion and give the parties "a chance to respond if I've missed something or if something is clearly contrary to what evidence you gave me, just so we start to hone it in a little bit better," before entering final judgment. As relevant to this appeal, the court's subsequent letter opinion ordered husband to pay wife spousal support in the amount of $1,000 per month for 60 months, rejected wife's argument that the Butte Falls property was a gift, and determined the following:

"The Butte Falls property is valued at $296,520. There was insufficient evidence at trial to establish exactly what

encumbrances exist against this property. One or both of the Kauffman judgments may be encumbrances; the 1988 Federal tax bill may be an encumbrance; and there was reference made to borrowing money against the property. [Wife] will be allowed to keep possession of the property if she can present a viable plan for selling off enough of this property to satisfy the following obligations:

"1. Pay off all encumbrances.

"2. Pay to respondent a sum equal to the following: $148,260 (1/2 of the value of the property), minus one half of all encumbrances. From the remaining balance, $60,000 would be deducted which represents the spousal support obligation as set forth above."

The court specifically invited the parties to respond to that proposed decision.

Husband responded by letter, noting the court's apparent adoption of wife's valuation of the Butte Falls property contained in exhibit 7 "without consideration of her subsequent bankruptcy filing * * * on August 25, 2005," in which "[wife] represented to the court that she claimed ownership of 'five separate parcels of real property comprising 117 acres located in Jackson County, Oregon which [wife] value[d] at approximately $1,000,000.' " Husband maintained his position that, "[b]ecause there was no appraisal of this property," "the most equitable disposition of this property is its sale and an equal division" of the proceeds. Husband further objected to the court's award of spousal support to wife without making findings, as well as to the method of payment. Wife also responded to the court's proposed decision with a list of questions and comments. After reviewing the parties' submissions, the court issued a second letter opinion, clarifying some points and articulating additional findings in support of the court's award of maintenance spousal support.

On October 17, 2006, the court entered a general judgment—drafted by husband's attorney—adopting its findings from the earlier letters and awarding the Butte Falls property to wife, if, within 15 days, she presented a "viable plan"[3] for selling or refinancing the property to pay off the encumbrances and to

---

[3] A "viable plan," according to the judgment, could include a provision for selling a portion of the property, borrowing against the property to pay off husband's

"[p]ay to [husband] a sum equal to: $148,260 (1/2 of the value of the property), minus one half of all encumbrances. From the remaining balance $60,000 would be deducted which represents the spousal support obligation as set forth in paragraph 5, reduced to $54,000 which the court determined as the present value of that support, further reduced by any payment of support made up to and before the time [husband's] interest is paid off and increased by any spousal support arrearage, including interest at the legal rate on unpaid installments. Any child support arrearage or other judgments owed to [wife] by [husband] shall be paid from these proceeds."

If wife failed to timely present a viable plan, the judgment provided that the property was to be sold and the proceeds divided according to the court's ruling.[4]

In accordance with the general judgment,[5] wife submitted a plan proposing to finance a 10-acre portion of the Butte Falls property and use the proceeds to satisfy her obligation to husband and pay off the various debts and encumbrances on the property.[6]

At a hearing on the proposal, husband, appearing without his attorney, expressed concern about the viability of the loan: "We're talking about a loan for $350,000 on a piece of property that's valued at $300,000. It seems a little bit suspect." At a second hearing on October 30, 2006, husband's counsel argued that wife's plan was not viable because (1) her

---

interest, or both. The plan was also required to include a list of encumbrances against the property and a proposal for how they were to be handled.

[4] The judgment also awarded wife legal custody of the parties' two minor children, ordered husband to pay child support for those children and a third child attending college, and divided wife's PERS account and the parties' personal property roughly equally.

[5] Based on the court's earlier letter opinions, wife anticipated the court's ruling and actually submitted her proposed plan before the general judgment was entered.

[6] Wife stated in her proposed plan that she had been "credit approved" to finance a 10.4-acre portion of the Butte Falls property. As attachments, she included a letter from her lender and a preliminary title report. The letter from the lender stated simply that wife "has been credit approved for financing on *the* property located at 8990 Butte Falls Highway." (Emphasis added.) The preliminary title report indicates that the loan was for $352,000 and that the title insurance covered all five tax lots included in the Butte Falls property. Thus, it is not clear from the record whether wife's loan was secured by a portion, or all, of the property.

bankruptcy petition had since been dismissed and foreclosure was proceeding against the Butte Falls Property; and (2) "[t]hat's in addition to the fact that she's been able to obtain financing on less than a tenth of the property for [sums] substantially in excess of what the Court determined to be the value." After considering husband's objections, the court entered a supplemental judgment, ordering implementation of wife's proposed plan.

## III.   ANALYSIS

### A.   *First Assignment of Error*

■         In his first assignment of error, husband argues that the trial court lacked statutory authority to enter the supplemental judgment incorporating wife's plan to refinance the property. According to husband, once the judgment was entered, the court "had the statutory authority to enforce its terms, but could not modify it by means of a supplemental judgment." Wife responds that the error was not preserved; on the merits, she argues that the supplemental judgment merely implemented or enforced the general judgment and thus was not an impermissible modification of it.

We agree with wife that husband did not preserve his claim of error. Husband asserts, without elaboration, that the error is preserved because, at the October 30 hearing, he objected to wife's plan for refinancing and asked the court to order a sale of the property. Husband's statement of the record is correct—throughout the proceedings before the trial court, including at the October 30 hearing, husband asserted that the Butte Falls property should be sold. However, at that hearing, husband objected only to the *substance* of wife's proposed plan. At no time did he object to the court's intention—as reflected in the court's letter opinion and in the general judgment—to approve the plan for final division of the property at a future time.[7]

■         In short, merely arguing against the substance of wife's refinancing plan was insufficient to alert the court to the alleged deficiency that husband now raises on appeal—

---

[7] Indeed, husband's attorney drafted the general judgment, which clearly anticipates future court approval of the plan for the final division of the property.

that is, that the court lacked statutory authority to implement that plan by way of supplemental judgment. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court[.]"); *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (to preserve a claim of error, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted").[8]

## B. *Second Assignment of Error*

█ Next, husband asserts that the trial court erred in undervaluing the Butte Falls property and awarding it to wife, rather than adopting husband's proposal that it be sold. Quoting *Stevenson and Stevenson*, 168 Or App 673, 680, 7 P3d 648 (2000), he contends that, because "the trial court 'was not provided with adequate information to assign a specific value'" to the Butte Falls property and was unsure of which of the parties' debts were liens against the Butte Falls property, the only equitable solution was to order that that property be sold. In response, wife argues, first, that husband's claim of error is unpreserved; on the merits, wife asserts that, under the circumstances, the trial court properly valued the property and made a "just and equitable" division of the property by awarding it to wife and requiring wife to pay husband for his interest in the property.

We begin with preservation. The precise value of the property was not an issue that either party focused on at trial—husband, because he maintained all along that the property should be sold; wife, because it was her position that the property was her separate property and, if the court determined otherwise, "[t]he only choice is to sell it[.]" Thus,

---

[8] In any event, husband's claim would fail on the merits. He points to *Thomas and Thomas*, 160 Or App 365, 369, 981 P2d 382 (1999), for the proposition that the property division provisions of a judgment are not modifiable. Although we do not disagree with that proposition as far as it goes, husband presents no reasoning as to why the supplemental judgment that the court entered here constitutes such a modification. The supplemental judgment does not change or alter the substantive provisions of the property division ordered in the general judgment; rather, it incorporates a plan to *implement* one of the alternatives ordered in that division. That, in our view, does not represent a modification of the property division.

at trial, both parties were operating under the assumption that, if the property was determined to be marital property, the property would be sold.

It was not until the court issued its first letter opinion that the court indicated that it intended instead to award the property to wife with an offsetting payment to husband and to base that award on the $296,520 valuation included in wife's exhibit 7. It was at that point—in response to an explicit invitation from the court to comment on its ruling before final judgment was rendered—that husband objected. Specifically, husband challenged the court's use of the $296,520 figure and asserted that, without better information as to the property's value, the most equitable disposition was to sell the property and divide the proceeds, the precise argument he now makes on appeal.

We conclude, under the circumstances of the case, that husband's actions were adequate to preserve his argument for appeal. First, given the way the issues were framed below, husband objected to the court's use of the valuation of the property contained in wife's exhibit at the first point in the proceedings at which he could fairly have expected that valuation was an issue. More significantly, the trial court had an opportunity to consider husband's argument and correct its error if warranted. *See Peeples v. Lampert*, 345 Or 209, 222, 191 P3d 637 (2008) (preservation rules "serve[ ] the salutary purpose of permitting the trial court to avoid making an error or to correct an error already made").

■　　　Turning to the merits, we first note that the success of husband's argument necessarily depends on his assertion that it was error for the court to use the $296,520 assessment of the property's value. Husband does not explain, however, how any evidence before the trial court persuasively contradicts the valuation on which the trial court relied, nor does our own examination of the record lead to that conclusion.

Husband references a subsequent bankruptcy filing in which wife allegedly valued the property significantly higher than the estimate used by the court. Husband also made that assertion in his response to the trial court's letter opinion; however, he did not move to reopen the record to

include evidence of that filing or ask the court to take judicial notice of it. In short, the evidence that husband refers to is not in the record before us and, therefore, we do not consider it.

Husband also points to evidence that wife was able to obtain a loan for $352,000 secured by the property. Husband provides no detailed argument as to why this necessarily renders the trial court's valuation invalid except to surmise that "[i]t is hard to imagine that a lender would loan [w]ife $352,000 on property worth $296,520." Without more, that evidence is insufficient to convince us that the trial court made a mistake. *Briggs and Briggs*, 49 Or App 569, 571-72, 619 P2d 1353 (1980), *rev den*, 290 Or 491 (1981) (" 'The role of the appellate court [on *de novo* review] is not to substitute its preferences for that of the lower court * * * unless our preference is motivated with sufficient conviction to proclaim that the trial court made a mistake.' " (quoting *McCoy and McCoy*, 28 Or App 919, 926, 562 P2d 207 (1977))); *see also Gardner and Gardner*, 212 Or App 148, 156, 157 P3d 320 (2007) ("This court repeatedly has stated that it will not micro-manage trial court decisions that disentangle the economic affairs of divorcing spouses, unless we can meaningfully improve on such decisions.").

In sum, although the evidence in the record regarding the property's valuation is admittedly scant, it nonetheless supports the trial court's determination of the issue. Husband chose not to present his own evidence of valuation at trial, nor did he make any attempt to reopen the record for that purpose after the court issued its letter opinion clearly expressing its intent to rely on the valuation contained in wife's exhibit. Instead, he remained steadfast in his position that the only option was to order a sale of the property and let the market determine its value. As a result, the only evidence before the court was wife's valuation. In the absence of any countervailing evidence, we agree with the trial court's decision to accept that valuation. As in *Stevenson*,[9] "[t]here is

---

[9] In *Stevenson*, the husband challenged a dissolution judgment on the basis that the trial court failed to assign a gross value to the wife's enhanced earning capacity. We affirmed, reasoning that, because the trial court awarded the husband the long half of the parties' assets by a margin that took into account the trial court's *best estimate* of the value of the husband's contribution to the wife's

ample authority for what was done here, namely, to make the best possible estimate of the value of husband's interest given the quality of the evidence." 168 Or App at 680. We decline to disturb the trial court's ruling.

## C.  *Third Assignment of Error*

In husband's final assignment of error, he asserts that the court erred in (1) ordering husband to pay maintenance spousal support to wife and (2) reducing that support obligation to a "lump sum present value." We begin with husband's first contention.

The trial court determined that wife was entitled to maintenance spousal support of $1,000 per month for five years, after finding that husband's current gross income is $4,800 per month and wife's current gross income is $1,700 per month. The court made the following additional findings:

> "The parties have lived in a marriage or marriage like relationship since 1975, more than 30 years. [Wife] is 53 years old, [husband] will soon be 57 years old. The evidence at trial established that husband, during the entire period of the relationship between the parties, had a significantly greater income earning capacity than did wife. Evidence further established that wife raised the parties' children, with very little assistance from husband."

Husband does not dispute the trial court's findings as to the parties' relative incomes, but contends that an award of support is not "just and equitable" under the circumstances of this case. The gist of husband's argument, as we understand it, is that because wife had four years prior to trial to establish her real estate career—the same amount of time as husband—"there is no reason to believe that her earning capacity does not equal that of [h]usband." Husband also notes that wife maintained a low standard of living during the marriage and that, although wife was primarily responsible for rearing the parties' children, only two were left at home at the time of trial.

Wife responds that the award is just and equitable because, due to her responsibility for caring for the children

---

enhanced earnings, the court discharged its responsibility to determine an equitable value of that asset. 168 Or App at 680-81.

and the property and dealing with the bankruptcy and dissolution, she has been unable to do the marketing necessary to establish herself as a real estate agent while husband, because he did not have those responsibilities, was able to devote himself full time to the real estate business. Wife also argues that the award is equitable because, using the incomes attributed to the parties by the court and considering the spousal support and child support ordered by the court, husband will still be left "with more income for a single person than [w]ife has for herself and two children."

Under ORS 107.105(1)(d), the court is empowered to award spousal support in an amount and for a duration that is "just and equitable for one party to contribute to the other[.]" In determining the amount and duration of maintenance spousal support, the court is to consider a number of enumerated factors, including the duration of the marriage, the age and health of the parties, the standard of living established during the marriage, the relative income and earning capacity of the parties, a party's employment skills and work experience, the financial needs and resources of the parties, custodial and child support responsibilities, and other factors the court deems just and equitable. ORS 107.105(1)(d)(C).

No single factor is dispositive. *Arand and Arand*, 182 Or App 368, 374, 49 P3d 799 (2002). But, as the Supreme Court has explained,

> "economic self-sufficiency of each spouse is to be the objective of a spousal support order pursuant to the statute. Thus, a spousal support order must recognize the effect of the marriage upon the capability of a spouse for economic self-sufficiency."

*Lemke and Lemke*, 289 Or 145, 148, 611 P2d 295 (1980). In setting the amount and duration of support, we keep in mind "the goal of ending the support-dependency relationship within a reasonable time if that can be accomplished without injustice or undue hardship." *Taylor and Taylor*, 136 Or App 416, 419, 902 P2d 120 (1995) (internal quotation marks omitted).

We first examine the relative income and earning capacity of the parties. As noted, in 2002, both husband and

wife obtained real estate licenses.[10] Husband began selling
real estate that year and testified to an average gross
monthly income, based on commissions, of $4,251.31. Wife,
on the other hand, has been employed full time as a real
estate agent only since April 2003. She testified that she
works 30 to 40 hours per week, also on a commission basis,
and that her gross income from real estate averages $1,000
month. She testified that she has been unable to fully devote
herself to selling real estate because of the dissolution and
bankruptcy litigation, maintaining the Butte Falls property,
and taking care of the parties' children. She estimated that it
would take her approximately five years to become estab-
lished in the real estate business, indicating that, by that
time, her youngest child would be 16 and would require less
of her time.[11] Husband did not offer any evidence to contro-
vert that testimony.

We turn to the other statutory factors. This is a long-
term marriage. Wife devoted her time and labor during the
past 25 years to raising the parties' six children, with little
direct involvement by husband; she also took care of the par-
ties' real property. As a result, with the exception of some
limited part-time work, she was out of the workforce during
that time. *See Taylor*, 136 Or App at 419 (the extent to which
a party's relative earning capacity is affected by an extended
absence from the workforce for family considerations is a rel-
evant consideration in determining spousal support). She
now has the opportunity to reach the earning capacity of hus-
band and become financially independent, but, given her
other responsibilities—responsibilities that ultimately bene-
fitted the marriage—she needs time to achieve that status.
Moreover, at least for the next several years, wife will con-
tinue to have responsibility for being the primary caretaker
of the parties' two minor children.

---

[10] Neither party reported any significant income from 1982 through 1997, with
the exception of 1992, when husband's income (for Social Security purposes) was
reported to be $35,700. From 1997 through 2002, both parties worked at relatively
low-wage jobs.

[11] She also testified that she has fibromyalgia but that, with treatment, it does
not prevent her from doing real estate work or from doing the physical work nec-
essary to take care of the Butte Falls property. Thus, we do not consider wife's
health a significant factor.

Husband points to wife's statement that she had a "pathetically low" standard of living during the parties' marriage. Although husband does not elaborate, to the extent we understand him to be arguing that an award of support is thus not appropriate because wife can maintain that standard of living without support, we reject that position. *See Smith and Smith*, 168 Or App 349, 354, 7 P3d 559 (2000) (stating that the primary objective of spousal support in a long-term marriage "is to provide a not-overly disproportionate standard of living to that achieved during the marriage when the supported spouse cannot do so on his or her own"). First, although a spousal support order must take into account the lifestyle enjoyed by the parties during the marriage, it is also based on circumstances existing at the time of dissolution. *Cullen and Cullen*, 223 Or App 183, 190, 194 P3d 866 (2008). Here, the court found that—at the time of dissolution—husband's income was $4,800 per month while wife's was significantly lower, at $1,700.

Moreover, one of the reasons that wife had such a low standard of living during the marriage is that she largely stayed out of the workforce in order to care for the parties' children; the marriage thus negatively affected her "capability * * * for economic self-sufficiency." *Lemke*, 289 Or at 148. Given those circumstances, and considering the parties' respective expenses, we find that the amount and duration of support ordered by the court is reasonable. We conclude that the trial court's award of spousal support in this case was "just and equitable."

The question remains whether the trial court erred, as husband contends, in reducing husband's spousal support obligation to its lump sum present value. Wife concedes error. However, we do not agree with the parties' understanding of the law and, accordingly, do not accept the concession. *See State v. Bea*, 318 Or 220, 224, 864 P2d 854 (1993) (holding that the Supreme Court need not accept party's concession concerning legal conclusion); *State ex rel Juv. Dept. v. Cowens*, 143 Or App 68, 71, 922 P2d 1258, *rev den*, 324 Or 395 (1996) (declining to accept state's concession of legal error); *see also Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, this court is responsible for

identifying the correct interpretation, whether or not asserted by the parties.").

Under ORS 107.105(1)(d), a dissolution judgment may provide "[f]or spousal support, an amount of money for a period of time as may be just and equitable for one party to contribute to the other, *in gross or in installments or both.*" (Emphasis added.) In this case, two provisions of the general judgment are relevant to the trial court's award of spousal support. Paragraph 5 awarded wife maintenance spousal support of $1,000 per month for a period of five years, or 60 payments, and provided:

> "After [husband's] payment of the 60th payment, or upon payment of the present value of the support upon [wife's] completion of her 'viable plan' under paragraph 6, spousal support automatically terminates."

Paragraph 6, in turn, first required wife, upon presentation of a viable plan for the Butte Falls property, to pay husband a sum equal to one-half the value of the property (less one-half of the encumbrances), and further provided:

> "From the remaining balance, $60,000 would be deducted which represents the spousal support obligation as set forth in paragraph 5, reduced to $54,000 which the court determined as the present value of that support * * *."

In supplemental briefing, husband argues that the court thus ordered both a monthly support award *and* a lump sum payment of support, a result not authorized by ORS 107.105(1)(d). Similarly, wife contends that the statute does not allow the type of "hybrid" the court imposed—that is, an award of monthly installments converted to a lump sum if wife can "pay off" husband. Wife argues that "the statute does not provide authority for the court to award installment payments on the one hand, but require them to be paid by a deduction from a party's share of property."

Under the methodology outlined in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), the text of a statute is the starting point for its interpretation and presents the best evidence of the legislature's intent. If the text in context is unambiguous, our inquiry is over. *Id*. In examining the text of a statute, "words of common

usage typically should be given their plain, natural, and ordinary meaning." *Id.* at 611.

ORS 107.105(1)(d) authorizes the court to award spousal support "in gross or in installments or both." "Gross" is pertinently defined as "an overall total exclusive of deductions." *Webster's Third New Int'l Dictionary* 1002 (unabridged ed 2002); *see also Black's Law Dictionary* 798 (8th ed 2004) (defining "in gross" as "[u]ndivided; still in one large mass"). "Installment" means "one of the portions into which a sum of money or a debt is divided for payment at set and usu. regular intervals." *Webster's* at 1171.

■ The judgment in this case provided alternative awards, *both* of which fall within the plain meaning of the terms of the statute: (1) set payments ($1,000), payable at regular intervals (monthly for five years), *i.e.*, an award "in installments"; and (2) an amount ($54,000), representing the "overall total" of the required installment payments (albeit reduced to its present value), *i.e.*, an "in gross" award. We fail to see—and the parties do not explain—how the court's decision to provide one as an *alternative* to the other in the event that a stated contingency—that is, wife's plan to refinance the property and pay husband his share of it—does not materialize, runs afoul of the statute *where both methods are expressly authorized* by the terms of the statute.[12]

■ The parties refer to the court's inability to modify an "in gross" award in the event of changed circumstances, as well as the potential negative tax implications of such an award, as reason for this court to find that the trial court erred. That, however, is an argument for the legislature.[13]

---

[12] Although not precisely on point, case law interpreting an earlier version of the statute, which authorized an award for maintenance "in gross or in instalments [*sic*]," Oregon Code, title VI, ch IX, § 6-914 (1930), lends support for our conclusion here. *See, e.g., Fuller v. Fuller*, 175 Or 136, 143, 151 P2d 979 (1944) (interpreting statute as permissive, rather than exclusive, and upholding award that included both). *Miles v. Miles*, 185 Or 230, 202 P2d 485 (1949), is not to the contrary, nor does it support wife's argument that "in gross" spousal support is precluded if an installment award would be adequate. Rather, in *Miles*, the Supreme Court held that "installment-alimony" without the addition of "alimony in gross" was all that could be reasonably imposed on the defendant *under the specific circumstances of the case, i.e.*, where the defendant could not pay the "in gross" amount and imposition of it would likely take all of the defendant's property. 185 Or at 237.

[13] We express no opinion as to the correctness of the parties' assessment of the consequences of an "in gross" award.

The fact that a ruling may be disadvantageous, or that both parties would prefer a different result, is not a basis for reversing a trial court's decision. *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]"). Here, the meaning of the statute is clear from its text. The trial court did not err.

Affirmed.