Argued and submitted December 22, 1998, affirmed September 22, 1999, petition for review allowed March 21, 2000 (330 Or 138)

STATE OF OREGON,
*Respondent,*
*v.*
JEFFREY DALE COOK,
*Appellant.*
(1396-08502; CA A99394)
986 P2d 1228

Dan Maloney, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Jennifer Scott Lloyd, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

EDMONDS, P. J.

Armstrong, J., dissenting.

_____

* Deits, C. J., *vice* Warren, P. J., retired.

## EDMONDS, P. J.

Defendant appeals from a judgment of conviction for possession of a controlled substance, ORS 475.992(4)(b) (1995), that was entered after a stipulated facts trial. He assigns as error the trial court's denial of his motion to suppress evidence obtained from a search of a duffel bag. We affirm.

■ The testimony of the investigating officers at the hearing was in conflict with the testimony of defendant in many respects. We are bound by the trial court's findings of historical fact if there is constitutionally sufficient evidence to support them. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.* Here, the trial court did not make express findings of fact. However, its ruling was consistent with the testimony of the officers. Thus, we state the facts consistent with the officers' testimony, facts that the trial court necessarily believed in order to reach its decision.

During the hearing on the motion to suppress, Officers Petermen and Reynolds testified that on September 8, 1996, at 1:30 a.m., they went to an apartment complex after they were advised through a radio dispatch of two persons possibly trying to commit thefts from vehicles. The officers testified that they did not know the name of the caller who had informed the police department of the two suspects and did not recall descriptions of the suspects. Both officers began looking for the suspects in the parking area of the complex. Although Officer Petermen saw no broken glass, he testified that windows are not always broken when items are stolen from cars. Subsequently, for approximately two minutes, Officer Petermen observed defendant, who was bent down next to a garbage dumpster adjacent to the parking area in the process of sorting clothing into a duffel bag. Defendant's back was toward the officer. The dumpster was in a semi-enclosed area. Officer Petermen testified that, based on defendant's behavior, "it seemed reasonable to believe that

the actions that he was doing would be something consistent with somebody who had committed a theft from a vehicle." Consequently, Officer Petermen testified that he "contacted [defendant] in the doorway [to the area containing the dumpster], asked [defendant] to step out, [and they] backed down the hallway." Defendant complied, after leaving the bag and clothing on the ground.

Officer Petermen testified:

"A.   Initially I asked [defendant] what it was he was doing. He told me he had been out for a walk when he discovered a pile of clothing there and he thought he may be able to use some of the clothing and so he was going through the clothing to find items which he may be able [to] use.

"Q.   Did he say whether the clothing or the bag or anything in there was his?

"A.   He said none of the items that he had been handling were his except a green army jacket also in there lying down."

Officer Reynolds also recalled that defendant originally "denied that any of the property in there was his and that he had just found all the stuff inside and was going through it to see what he wanted to take home."

Subsequently, Officer Petermen returned to the enclosure where the dumpster was located. During that time, defendant remained outside with Officer Reynolds. When Officer Petermen searched the bag, he

"found clothing, [a] magazine and a syringe with a kitchen-type knife bound together with string as well as two silver spoons, one contained a white powder substance with a small piece of white colored wadding along with a second silver spoon, clear plastic baggie and a Snickers candy bar."

Officer Petermen also found the name, "Doreen Cook," written on the inside of the bag. Thereafter, the officer returned to defendant, who again denied that the bag was his. After Officer Petermen ascertained that the name of defendant's wife was Doreen Cook and indicated to defendant that that name was on the bag, defendant admitted that the bag was his.[1]

_____

[1] At the hearing on the motion to suppress, defendant testified that, while he was going through the pile of clothes, he heard the sound of squeaking leather and

Before trial, defendant moved to "suppress[ ] the stop of the defendant on or about September 8, 1996, the search of a bag belonging to the defendant, and the seizure of any and all evidence obtained as a result therefrom, including the seizure of a controlled substance and all oral derivative evidence." Defendant asserted to the trial court that the officers' conduct violated his privacy interests and his "property" interests under Article I, section 9, of the Oregon Constitution.[2]

In denying the motion to suppress, the trial court ruled:

"However, I think that given the totality of the circumstances the officer had probable cause to suspect that a crime had been committed and that the search of the duffel bag was reasonable under the totality of the circumstances, particularly since the defendant initially denied ownership of the bag prior to the search, and that seems to be instructive in the cases.

"Certainly with the type of crime that had been reported which the officer had knowledge, the possibility certainly someone looking through a suitcase or duffel bag with car clouting going on in the area would be the thing that might be incidental to discovery of criminal activity.

"I think it was completely appropriate for the officers to determine ownership of the bag, not only to return the bag to the appropriate owner but to determine if the bag had indeed been [the] result of some type of car clout. So I think it's part of their appropriate investigative activity particularly when the defendant denied any proprietary interest in the bag prior to the search and certainly would be important to check the contents of the bag to presume evidence in that regard.

"* * * * *

"I am going to find the search is reasonable. I'm going to deny the motion to suppress."

---

"stopped and turned, seen both officers approach [him], grabbed [his] arms, put them behind [his] back." According to defendant, his pockets were searched at that time, and he was handcuffed.

[2] Article I, section 9, of the Oregon Constitution, provides, in part:

"No law shall violate.the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

On appeal, defendant assigns as error the trial court's denial of his motion to suppress. There are two issues presented by this appeal: (1) whether the police stopped defendant and, if so, whether the stop was based on reasonable suspicion; and (2) whether the search of the duffel bag by the police violated Article I, section 9.

We begin by determining whether defendant was stopped.[3] The determination of whether an individual is stopped is a legal conclusion. *See State v. Bea*, 318 Or 220, 224, 864 P2d 854 (1993) (reasoning that the court need not accept the state's concession that the defendant was stopped unlawfully because it was a concession concerning a legal conclusion). "A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place." ORS 131.605(5) (1995). In *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991), the Supreme Court indicated that, under section 9, no justification is required for an encounter with police that does not involve any restraint of liberty. In contrast, if an encounter constitutes a stop within the meaning of section 9, it must be justified by reasonable suspicion. The court in *Holmes* explained:

> "We hold that a 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." 311 Or at 409-10.

Thus, whether a restraint of liberty occurs that is sufficient to implicate section 9 depends on the facts of each case. For instance, in *State v. Johnson*, 105 Or App 587, 590-91, 805 P2d 747 (1991), we held that a police officer's show of authority transformed a conversation into a stop. The officer had requested that the defendant step out from behind a bush and walk 15 feet to where the officer stood, thus altering the defendant's course of travel.

---

[3] In *Ehly*, the Supreme Court indicated that "[t]he analysis of a defendant's rights under ORS 131.605 to 131.625 is substantially the same as the analysis of rights under Article I, section 9, of the Oregon Constitution." 317 Or at 76 n 8.

■ Here, the trial court did not indicate whether it concluded that defendant was stopped. Nonetheless, we conclude that defendant was stopped. Officer Petermen contacted defendant in the doorway to the enclosure in which the dumpster was located and asked him to step out. Defendant left the bag, the clothing and his coat on the ground, and he and Officer Petermen walked to where the other officer was located. As in *Johnson*, the officer's show of authority intentionally interfered with defendant's freedom of movement.

Defendant contends that the stop was not justified by reasonable suspicion because it was based on an anonymous phone call about which the officers were advised through a radio dispatch. Specifically, defendant asserts:

> "None of the factors of reliability are present in this case. The informant may have provided a name, but no name is available on this record. The report is not specific and there are no details to allow the inference that the informant speaks from personal observation. The officers saw no evidence at the scene to corroborate the report of car prowls in the area."

ORS 131.615(1) (1995) provides:

> "A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

Under ORS 131.605(4) (1995) " '[r]easonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts as authorized in ORS 131.605 to 131.625." In *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997), the Supreme Court held that, under ORS 131.605, an officer must subjectively believe that the stopped individual has committed a crime and that the belief must be objectively reasonable. In *Ehly*, the Supreme Court said "[i]f a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime, the officer has 'reasonable suspicion' and hence may stop the person for investigation." 317 Or at 80.

■     In *State v. Villegas-Varela*, 132 Or App 112, 887 P2d
809 (1994), we held that, "[w]hen reasonable suspicion is
based solely on a citizen informant's report, that report must
contain some indicia of reliability." Three factors that may be
used to determine reliability are: (1) whether the informant
is exposed to civil or criminal sanctions if the report is false;
(2) whether the report is based on personal observation,
which may be inferred from the detail of the report; and
(3) whether the officer's observations corroborate the report.
*Id.* at 115.

7.     Here, the officers testified that they did not know the
name of the caller and did not recall descriptions of the sus-
pects.[4] However, the report was made in the early morning
hours and indicated that there were two individuals who
might be trying to steal items from cars in the parking lot of
the apartment complex. When the officers arrived at the
reported address of the apartment complex at 1:30 a.m., they
searched the parking lot for suspects. Then Officer Petermen
observed defendant in the dumpster enclosure sorting cloth-
ing into a bag. Officer Petermen testified that he believed
that defendant's acts were consistent with someone who had
just committed a car prowl. Under the circumstances, includ-
ing defendant's proximity to the parking lot, his activities
and the time of night, we conclude that the officers had an
objectively reasonable suspicion that defendant was involved
in the reported car prowls.

■     We now turn to the search of the bag. In this case, the
officers did not have a search warrant to search the bag.
Moreover, it is clear that defendant had a privacy and posses-
sory interest in the bag and its contents before the bag was
searched. It is uncontroverted that the bag belonged to him
or to his wife.[5] Had defendant told the officers that the bag
was his, any ensuing search without his consent would have
violated section 9. However, defendant misled the officers.

---

[1] The record is unclear as to whether the caller provided a name to the police
department. Officer Petermen testified that he did not know the caller's name and
did not know whether the caller's name was supplied to the state. Officer Reynolds
also testified that he did not know the name of the caller, but that "[i]t's available.
At that point we didn't ask for it. It's fairly common."

[5] After the contraband was seized from the bag, the bag was returned to
defendant.

He affirmatively told them that "none of the items that he had been handling were his except a green army jacket also in there lying down." He also said "that he had just found all the stuff inside and was going through it to see what he wanted to take home." As a result, the officers proceeded with their investigation and searched the bag. The issue under section 9 focuses on the legal import of those statements to the officers.

■        Defendant argues:

"Defendant in this case adequately asserted his rights to the duffel bag. He asserted a possessory right at the scene when he told the police he was putting clothes in the bag, when he told the police the bag and fix kit were his and when he accepted the return of the bag after being arrested. Defendant also assert[ed] a privacy right during the motion to suppress. The lone fact that upon first being questioned, defendant said the bag did not belong to him does not defeat the application of Art[icle] I, [s]ec[tion] 9."

The state counters:

"Defendant's rights were not violated by the officer's search of the bag because he relinquished any possessory or privacy interest in the bag and its contents. He relinquished those interests by leaving the items on the ground when he agreed to talk with the officer, walking away from them, and repeatedly denying that the items were his."

The arguments pose the question of whether defendant's disclaimer of ownership should be held to be an abandonment of his protected interests in the bag. In *State v. Morton*, 326 Or 466, 470, 953 P2d 374 (1998), the court recognized that an abandonment of privacy and possessory interests in a protected container before a search or seizure occurs can defeat the right to have evidence suppressed. "A number of courts have held that an abandonment may arise out of a disclaimer of ownership which is made in response to police questioning." Wayne R. LaFave, 1 *Search and Seizure* § 2.6(b), 581 (3d ed 1996) (footnotes omitted). The issue turns on whether defendant intended to forego exercising his possessory and privacy interests in the bag. In making that determination, we examine the totality of the circumstances. *See Morton*, 326 Or at 469-70 (holding that the defendant had

a protected interest in a container despite her disclaimer of ownership because the defendant had "been in personal possession of the container in question only moments before it came into the possession of the police" and that the seizure of the container could not be separated from the unlawful arrest).[6]

Among the circumstances that comment significantly on whether a voluntary relinquishment of defendant's interests occurred are whether the officers were acting illegally or in a coercive manner to prompt defendant's statements. Here, unlike in *Morton,* the officers had made a lawful stop before the bag was searched and were in the process of a lawful investigation when defendant disclaimed ownership

---

[6] This case is not controlled by *State v. Creighton,* 142 Or App 378, 921 P2d 1339 (1996). In *Creighton,* the defendant was arrested on an outstanding warrant. At the time, he was riding a bicycle and was carrying a backpack across his shoulder. After being handcuffed, he was escorted to a patrol car. While in the patrol car, the defendant requested that a companion take the bicycle and the backpack to his girlfriend's house. The officer agreed, but said he needed to check the pack for weapons and contraband. At that point, the defendant said that he did not know what was in the backpack and that it belonged to his girlfriend. The ensuing search of the pack revealed controlled substances, which led to the charges against the defendant. At the conclusion of the hearing concerning the defendant's pretrial motion to suppress the contents of the backpack, the trial court found that the defendant had established a protected interest in the pack and its contents. However, in denying the defendant's motion, the trial court reasoned that the defendant had disclaimed any protected interest in the backpack by his statements to the officer.

On appeal, we reversed the trial court's ruling. We said:

"Here, the fact that defendant said the pack belonged to someone else does not make the pack and its contents any less private with respect to an unlawful entry by the police. Defendant's statement is extraneous to an assessment of whether Article I, section 9, 'has been violated.' Nor is defendant's statement that the pack belonged to someone else necessarily *determinative* of any privacy interest defendant may have had in the pack and its contents by virtue of his possession of it, regardless of its legal ownership.

"The court found that the pack and its contents belonged to defendant and that 'defendant established a protected right in the property.' The state does not challenge that finding. In the absence of defendant's consent, the court's finding that 'defendant established a protected right in the property' compels the conclusion that the illegal search of the pack violated defendant's privacy interests under Article I, section 9." *Creighton,* 142 Or App at 382 (citations omitted; emphasis in original).

Here, defendant represented that he had no interest in the bag and the clothing, except for the coat, and that they had been discarded by others. Thus, defendant's dissociation from the bag and clothing is in sharp contrast to the defendant's efforts in *Creighton* to protect his protected interests by effecting the transfer of the backpack to his girlfriend.

of the items. There was no coercion or exploitation of any illegality that produced his disclaimer. Moreover, defendant not only voluntarily disclaimed any personal interest in all the items except for the coat, but he also asserted that the items had been abandoned in the dumpster area by their owner.[7] We hold that under the circumstances, defendant abandoned his interests under section 9 in the bag before the search occurred. Thus, we affirm the trial court's denial of the motion to suppress.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority asserts that, for the purposes of Article I, section 9, defendant had abandoned his interest in the bag before it was searched, 163 Or App at 34, and relies on *State v. Morton*, 326 Or 466, 953 P2d 374 (1998), for the proposition that abandonment of a possessory interest in a protected container before a search or seizure occurs can defeat the right to have evidence suppressed. 163 Or App at 32. While I agree with the majority as to that general proposition, I disagree that that is what happened here.

The officers stopped defendant as he was sorting clothing into a duffel bag. Officer Reynolds testified that defendant told him that he "had just found all the stuff inside and was going through it to see what he wanted to take home." There are two possible explanations of defendant's statement: Either the bag and its contents really did not belong to him and had been abandoned by someone else, or they did belong to him and he was disclaiming an interest. It does not matter, however, which interpretation we choose— in any event, defendant was clearly in possession of the bag

---

[7] Defendant told the officers that he had found the clothing and the bag and "that none of the items that he had been handling were his except [the jacket]." The dissent would hold that defendant's disclaimer of ownership was not a legal abandonment of any possessory or privacy interest in the bag or the clothing because he told the officers that he was going through the items to determine whether he might take some of them home. According to the dissent, his statements to the officers stated an "intent to retain possession of at least some of the items." 163 Or App at 36. That assertion ignores the uncontradicted facts that, after being contacted by the officers, defendant repeatedly denied that any of the items including the bag were his and attempted to disassociate himself from them by representing that they were not his.

and its contents at the time and, therefore, had a possessory interest in them that the officers violated when they searched the bag and seized the evidence that defendant now seeks to suppress. That is not unlike the facts in *Morton*, where the defendant disclaimed an interest in a plastic container that fell from her jacket while she was being placed under arrest. The court there stated that

> "the uncontradicted evidence * * * showed that this defendant had, in fact, been in personal possession of the container in question only moments before it came into the possession of the police. Although defendant denied vehemently any ownership interest in or knowledge of the contents of the container, there was no debating the fact that she possessed it."

326 Or at 469-70. The court in *Morton* went on to state that, because the defendant's dropping of the container could not be separated from the act of arrest, the defendant had not abandoned the container before the arrest. Because of the circumstances of the arrest, the court did not have to determine whether the defendant had abandoned the container at all.

In *State v. Belcher*, 89 Or App 401, 749 P2d 591, *aff'd* 306 Or 343, 759 P2d 1096 (1988), we stated that, although abandonment is a principle imported from property law, "[f]or constitutional purposes 'abandonment' addresses a different concern and has a different focus." *Id.* at 404. The concern, we held, was whether the owner had left his or her property under circumstances that objectively made it likely that others would inspect it. *Id.* In that case, the defendant had been involved in a fight in a parking lot and, when police arrived, had fled, leaving behind a wallet and a backpack. An officer opened the wallet and found the defendant's identification. The officer then asked bystanders whether they knew the backpack's owner, but none did. The officer then opened the backpack and searched its contents and found jewelry that he believed to have been stolen. When police went to the defendant's house the next day, he admitted that the backpack was his but denied ownership of the jewelry. We held that, because the backpack had been left in a public parking lot after the participants in a fight had fled, it was reasonable to assume that a police officer investigating the fight would

inspect the pack in order to determine its owner. Like the dissent in *Belcher*, I fail to see how an individual who has not abandoned his or her ownership or possessory interest in property nevertheless could abandon the constitutional right under Article I, section 9, not to have that property searched or seized unreasonably. I believe that, to the extent it rejected the application of the principles of abandonment found in property law, *Belcher* was wrongly decided and is inconsistent with more recent decisions by this court and by the Supreme Court.[1]

Abandonment of ownership requires the voluntary relinquishment of the property in question with the intention of terminating ownership of it without vesting that ownership in another person. *Dober v. Ukase Investment Co.*, 139 Or 626, 629, 10 P2d 356 (1932). In this case, there is no question that defendant was in possession of the bag and its contents at the time that he was stopped by the police. Whether or not the items originally had been abandoned by someone else is not relevant; the relevant fact is that defendant had possession of them at the moment in question. Thus, the question is whether defendant voluntarily relinquished possession of the bag and its contents with the intention of terminating his ownership of those items. I conclude that the record does not support such a finding. Defendant told the officers that, although the items in question were not his, he had been going through them to see what he might take home. That was a statement of intent to retain possession of at least some of the items. The fact that defendant left the bag a few feet away on the ground when he walked out of the alley to talk to the officers does not, without more, indicate an intention to abandon the bag. Without further evidence of defendant's intention to abandon the items, the majority errs in determining that he did.

---

[1] Even if we were to assume, for the purposes of this opinion, that *Belcher* was correctly decided and that there is a difference between abandonment for property law purposes and abandonment for constitutional purposes, the facts in *Belcher* are distinguishable. Here, defendant had not left the property with no indication of return or in a way that could lead a reasonable person to conclude that he was not going to return for the property.