Argued and submitted December 23, 1999, affirmed October 18, 2000

# STATE OF OREGON,
*Appellant,*

*v.*

# EDWARD J. SILVA,
Michael Angelo Harris,
*Respondents.*

## (97-4531-A-F-E; CA A101140)

13 P3d 143

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

James N. Varner argued the cause for respondents. With him on the brief was David E. Groom, Public Defender.

Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

Armstrong, J., concurring.

## EDMONDS, P. J.

Defendants Silva and Harris are charged in the same indictment with first-degree burglary, ORS 164.225, and first-degree theft, ORS 164.055. The state appeals from pretrial orders suppressing evidence, including evidence obtained from the search of a duffel bag that was on the back seat of the car that Silva was driving and in which Harris was a passenger.[1] ORS 138.060(3). We affirm.

■ Under *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993), we are bound by the trial court's findings of historical fact if there is constitutionally sufficient evidence to support them. "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.* Here, the trial court found "that the testimony of Deputy Chief Norris and Detective Ford [is] truthful and reliable and accurately state[s] the facts." Thus, we state the facts according to Ford's testimony because he was the officer involved in the events at issue.

At approximately 10:25 a.m. on September 24, 1997, Ford was on duty in an unmarked car when he received a report concerning a twelve-year-old boy who had reported during a 9-1-1 call that he was home alone and that a white adult male and a black adult male, both approximately 16 to 19 years old, were in the backyard of his residence. Ford knew that, approximately one week earlier, a residential burglary had occurred in the late morning and that the victim had seen a white adult male and a black adult male near her residence before that crime happened. Ford responded to the call along with other officers. Ford testified that the suspects

---

[1] In their motion to suppress the evidence resulting from the search of the duffel bag, defendants asserted that their rights under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution had been violated. Article I, section 9, of the Oregon Constitution, provides, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" The Fourth Amendment to the United States Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

could not be located by the time that another officer contacted the boy.

Ford remained in his car on a side street in an area that was south of the residence from which the boy called. Ford thought "that the four patrol units rolling into the area might flush these individuals out." At approximately 10:54 a.m., Ford observed a vehicle with occupants matching the boy's description. He also recognized the driver as Silva and testified that he believed that another officer had probable cause to arrest Silva for another crime.[2] Ford stopped the vehicle. He immediately handcuffed and arrested Silva and informed him of his *Miranda* rights. At some point, Ford also detained Harris.

After Silva was arrested, Ford determined that Silva was driving with a suspended license. He explained:

"Q. * * * [W]hen you stopped [Silva], did you eventually find out that he was suspended?

"A. Yes, we did.

"Q. And as a result of that suspension[,] what is Medford's policy?

"A. Medford's policy now on a[n] individual that is driving while suspended, we tow the vehicle and our policy is that we complete a thorough inventory inside the vehicle.[3]

"Q. And do you know whether or not * * * that policy includes opening closed containers?

"A. Yes. We had been directed that we will open closed containers.

---

[2] So far as this record discloses, Ford did not ultimately book Silva for that crime.

[3] According to Norris, a City of Medford ordinance authorized police to impound the vehicles of individuals who are driving while their licenses are suspended, and it required the police to inventory the impounded vehicle. Norris also testified that the operating procedure for an inventory requires officers "to inventory all portions of the vehicle including closed containers." Copies of what appear to be the city code were admitted as evidence before the trial court as were copies of the police department's policy and procedure. An internal police memorandum entitled "**DWS/NO INSURANCE TOW PROCEDURES**" provides, in part, "[i]nventory vehicle including closed containers (if contraband is discovered you can now charge the suspect[.])" (Emphasis in original.)

"Q. Now, when you inventoried this specific vehicle, can you tell the Court what containers—what you opened?

"A. We opened a large, it's approximately two and a half feet long, red duff[el] bag which was in the back seat of the car.

"Q. Was there another bag that was opened?

"A. Yes, there was. When we opened that bag there was a blue denim bag inside of that—the larger red bag and we opened that as well.

"Q. And my understanding, just for Court's clarification, was that evidence related back to a burglary that was found in those?

"A. That's correct.

"* * * * *

"Q. Did you ask Mr. Silva and/or Mr. Hart [for] consent to search?

"A. Yes.

"Q. What was the response[?]

"* * * * *

"[A.] They both stated that the bag was not theirs. I asked them specifically if the bag was theirs. They both stated it wasn't. They both stated they did not know whose it was.

"* * * * *

"Q. Did they ever claim knowledge of the bag?

"A. No. Neither before opening or after opening it."

Ford testified that Silva explained that he was in the area near the boy's residence to "look for John's house" and that he and Silva discussed what happened at the boy's residence and the contents of the car and duffel bag during Harris's detention.

After defendants were charged in this case, they moved to suppress the evidence resulting from the search of the duffel bag. The trial court granted that motion, prompting this appeal. The trial court's order suppressing the evidence provides, in part:

"The court finds that there was no evidence of probable cause to arrest Edward Silva for the burglary of the Dixie Street (or Dixie Road) address other than Detective Ford's mere statement that Officer Blair had probable cause to arrest Silva for that burglary. This is insufficient evidence to allow the court to make a finding that, in fact, there was probable cause.

"The court does find that there was reasonable suspicion for Detective Ford to stop the vehicle operated by Silva and occupied by Harris based upon the fact recited by Ford concerning the suspicious persons report. The previous daylight burglary in the same area and the information from Officer Blair that he had probable cause to arrest Silva on another burglary.

"The court finds that the vehicle was properly seized and inventoried pursuant to a properly authorized program based upon the Municipal Ordinance and Medford Police Department policy, designed and systematically administered to achieve the stated purpose to protect the * * * property of person[ ]s that are contained in seized vehicles and to protect the police, towing agents, and storage people from fraudulent claims. There is no evidence that discretion on behalf of the police officer is allowed except for the speculative claims of defense counsel.

"There is also no evidence, except that urged by defense counsel which would require speculation, that the search was for evidence of a crime instead of for the stated purpose of Detective Ford that it was for inventory purposes.

"The defendant's denial of ownership would likely cause the officer more concern about conducting a proper inventory to protect the property of an unknown third party.[4]

"Oregon case law however, does not allow for an inventory of the contents of closed containers while Federal cases apparently do allow such a thorough inventory * * *.

"* * * Therefore the Defendants' Motion to Suppress is Granted."

The state makes three specific arguments in support of its contention that the trial court's ruling was error: (1) the

---

[1] We understand the trial court's ruling in this paragraph as well as the preceding paragraph to reflect an implicit finding that Ford's request to search the bag was not for the purpose of investigating the boy's report.

fact that the duffel bag was in the back seat of the car that Silva was driving and in which Harris was a passenger does not establish that defendants had a protected interest in the bag; (2) even if defendants had a protected interest in the bag, they abandoned their interest by denying that the bag was theirs; and (3) if defendants had a protected interest in the bag, the inventory policy authorized the police to open the duffel bag.

"[I]n the context of a warrantless search, a defendant is not required to assert a protected property or privacy interest on which the state intruded. Rather, consistent with ORS 133.693(4),[5] the burden is on the state to prove that the warrantless search did *not* violate a protected interest of the defendant." *State v. Tucker*, 330 Or 85, 88-89, 997 P2d 182 (2000) (emphasis in original). In this case, Silva said that the vehicle was not his, and the record does not reveal who owned the car. However, Silva had control of the vehicle as its driver, and Harris was a passenger in the vehicle at the time that the bag was searched. In *Tucker*, the court rejected the state's argument that "a passenger in an automobile has no protected privacy or property interest in the automobile or its contents." 330 Or at 88. Thus, under *Tucker*, we hold that both Silva and Harris had a protected interest under Article I, section 9, in the duffel bag and its contents.

The next issue is whether defendants waived their right to assert their Article I, section 9, interests in the bag. According to the court in *Tucker*, its opinion in *State v. Morton*, 326 Or 466, 953 P2d 374 (1998), "demonstrates that a defendant's denial of a protected interest is not necessarily dispositive of whether the state has met its burden of proving the validity of a warrantless search."[6] *Tucker*, 330 Or at 91. We applied the holding in *Morton* in *State v. Cook*, 163 Or App 24, 986 P2d 1228 (1999), *rev allowed* 330 Or 138 (2000).

---

[5] ORS 133.693(4) provides:

"Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution."

[6] The state's position when this case was decided by the trial court was that defendants had the burden of proving that they had a protected interest in the duffel bag. Case law decided after this case was presented to the trial court and originally briefed to us clearly establishes that that position is incorrect.

In *Cook*, the police went to an apartment complex at approximately 1:30 a.m. after a report that individuals were trying to commit thefts from vehicles. The police observed the defendant bent down next to a garbage dumpster that was in an area adjacent to the apartment complex's parking lot in the process of sorting clothing into a duffel bag. We held that the officers lawfully stopped the defendant in order to inquire about his activities. The defendant denied that the bag and the clothes, except for a green army jacket, were his both before and after the warrantless search by one of the police officers. Eventually, the defendant admitted that the bag was his. We reasoned:

> "Among the circumstances that comment significantly on whether a voluntary relinquishment of defendant's interests occurred are whether the officers were acting illegally or in a coercive manner to prompt defendant's statements. Here, unlike in *Morton*, the officers had made a lawful stop before the bag was searched and were in the process of a lawful investigation when defendant disclaimed ownership of the items. There was no coercion or exploitation of any illegality that produced his disclaimer." *Cook*, 163 Or App at 33-34.

Our decision in *Cook* was followed by *State v. Ray*, 164 Or App 145, 990 P2d 365 (1999). In that case, we held that the trial court properly denied the defendant's motion to suppress evidence obtained from a search of a gym bag during the course of a traffic stop because the defendant had abandoned his protected privacy interest in the bag by disclaiming any interest in it. We said that, to determine whether a defendant abandons a constitutionally protected interest after the police engage in unlawful conduct, we must decide "whether the abandonment of the container was prompted or coerced by illegal police conduct." *Ray*, 164 Or App at 153. For purposes of our opinion, we assumed that the police officer's request for the driver's consent to search her car was an unlawful extension of a traffic stop. However, the record did not support a determination that the defendant passenger's disclaimer was an exploited product of the request made to the driver. We concluded:

> "Before searching the car, [the officer] gave defendant the opportunity to declare that the gym bag was his. Instead,

defendant stated that he had no property in the car. The fact that defendant may have disclaimed his ownership of the bag because he feared that [the officer] would search it during his search of the car 'is not a ground on which to hold that his privacy or possessory interest in the [bag] was violated.' " *Ray*, 164 Or App at 153 (citation omitted; third set of brackets in original).

As in *Cook* and in *Ray*, the question in this case is whether the state has demonstrated that the disclaimers by defendants were not prompted or coerced by illegal police conduct. If they were, no voluntary waiver of any protected interest of defendants in the duffel bag occurred. The trial court ruled that there was reasonable suspicion to stop the car. However, the trial court also ruled that the state produced insufficient evidence to demonstrate that there was, in fact, probable cause to arrest Silva based only on Ford's statement that another officer had probable cause to arrest Silva for a crime. In *State v. Pratt*, 309 Or 205, 216, 785 P2d 350 (1990), the Supreme Court stated:

> "A peace officer who does not himself have probable cause to arrest a felony suspect nonetheless may arrest the suspect if he *reasonably* believes that the officer or officers who have requested the arrest do have probable cause to make that arrest and if probable cause to arrest does, in fact, exist." (Emphasis in original.)

We agree with the trial court that the state has failed to prove that the officer who Ford believed had probable cause to arrest Silva actually had probable cause. Consequently, for purposes of this opinion, we treat Silva's arrest as illegal.

■ As to Harris, the duration and the scope of inquiry regarding the restraint of his liberty are circumscribed by ORS 131.615 (1995), which provides:

> "(1) A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.
>
> "(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

> "(3)   The inquiry shall be considered reasonable if it is limited to * * * the immediate circumstances that aroused the officer's suspicion."

Ford testified that he contacted Harris and began to question him. Ford also said that Harris "was not free to leave" at the time and that there was also a discussion about the bag. We have found no evidence in the record that suggests that Harris's detention was ever terminated before the request for the search of the bag was made. The record is also unclear as to whether defendants disclaimed any interest in the bag before or after Ford learned that Silva was driving with a suspended license. The most reasonable inference from the record is that Harris's detention was ongoing at the time of the search of the bag. The trial court also appears to have found that Ford's request to search the bag was made for the purpose of inventorying the contents of the car so that it could be towed, a purpose unrelated to the investigation of the suspicious persons report. There is evidence to support that finding. In other words, it could be inferred that Harris was being detained in violation of ORS 131.615 at the time of the request to search.

In that light, our analysis is informed by *Morton*, in which a plastic container fell from the defendant's jacket while she was being unlawfully arrested. The defendant denied any connection to the container. The state argued that the defendant had in fact abandoned the container, but the Supreme Court rejected that argument. It reasoned that because the state could not separate the act of the dropping of the container from the unlawful arrest, it had not carried its burden of proving a voluntary abandonment.

Here, the state has not met its burden of proving that Silva was lawfully arrested and that Harris's detention was over before the request to search and the disclaimer were made. It is that conclusion that distinguishes this case from *Ray* and *Cook*. In *Cook*, the officers made a lawful stop before the bag was searched and were in the process of a lawful investigation when the defendant initially disclaimed any interest. In *Ray,* an officer made a lawful traffic stop of a car in which Ray was a passenger. However, Ray was not the subject of the traffic investigation. The officer asked the

driver if he could search her car and its contents, and she agreed. Before conducting the search, the officer asked the defendant if he had any property in the car, and he said, " 'No.' " *Ray*, 164 Or App at 148. The officer searched the bag and discovered controlled substances. As a result, he arrested both the driver and Ray. In support of his motion to suppress, the defendant argued that the driver lacked authority to consent to the search of the bag. However, we reasoned that the defendant's privacy interest in the bag was unaffected by the driver's consent, even if that were the case. When Ray was given the opportunity to declare that the gym bag was his, he stated that he had no property in the car. Had he asserted sole ownership in the bag, the officer would have had no legal basis upon which to search, without Ray's consent. Even assuming that the officer's request of the driver for consent to search was an unlawful extension of the traffic stop, we held that Ray abandoned his privacy interest in the bag. Unlike in *Ray*, the evidence here is subject to a reasonable inference that there was an unlawful restraint of Silva's and Harris's liberty at the time of their disclaimers of ownership of the duffel bag.[7]

    In summary, this case is resolved by the state's failure to demonstrate the validity of the warrantless search of the bag. In *Morton,* that burden was not carried because the discovery of the container could not be separated from the illegal arrest of the defendant. In this case, in the absence of a demonstration by the state that Silva's arrest and Harris's detention were lawful, the state has the burden of proving that defendants' disclaimers were not prompted or coerced by their illegal detentions. While it is correct that a *"but for"* analysis is inappropriate and that a fear on the part of a

---

[7] Although neither party raised this statute to us, we note that ORS 136.432 provides, in pertinent part:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution[.]"

In *Ray*, we noted that that law "applies retroactively to 'all criminal actions pending on or commenced after December 5, 1996.' Or Laws 1997, ch 313, § 38." However, "[t]he analysis of a defendant's rights under ORS 131.605 to 131.625 is substantially the same as the analysis of rights under Article I, section 9, of the Oregon Constitution." *Ehly*, 317 Or at 76 n 8.

defendant that a search would reveal incriminating evidence is not a ground upon which to hold that an Article I, section 9, interest is violated, *Ray*, 164 Or App at 152-53, in order to carry its burden the state must demonstrate that defendants were no longer operating under the influence of the illegal restraint of their liberty at the time of their disclaimers. Our review of the record demonstrates no circumstance that suffices in that regard.

■        Finally, we turn to the state's argument that the inventory policy authorized the police to open the duffel bag. In its brief, the state argues:

> "The state is aware that this court has held that an inventory cannot constitutionally authorize opening closed containers, or at most can authorize opening only closed containers designed to hold valuables. * * * The state did not argue in the present case that the duffel bag fell within the 'container designed to carry valuables' exception. Consequently, under this court's opinions the opening of the duffel bag, although done pursuant to an otherwise lawful inventory, violated the Oregon Constitution. The prosecutor argued below that this court's opinions are incorrectly decided, and that inventory policies should be permitted to include opening closed containers. The state submits the following argument in support of that position[.]"[8]

Thus, the state's only position on appeal is that we should overrule our previous cases under Article I, section 9, of the Oregon Constitution, and allow the opening of all closed containers during an inventory. We decline the state's invitation, and continue to adhere to our prior decisions. Consequently, the trial court did not err in granting defendants' motion to suppress the evidence resulting from the search of the duffel bag.

        Affirmed.

---

[8] The state acknowledges that its argument in this case was "taken largely from the state's brief in [*State v.*] *Maynard,* [149 Or App 293, 942 P2d 851 (1997), *rev den* 327 Or 448 (1998)]." We rejected similar arguments in *Maynard*.

**ARMSTRONG, J.,** concurring.

I concur in the decision to affirm the order that granted defendants' motion to suppress. I write separately, however, to describe the analysis that I believe should govern our decision.

The majority concludes that defendants abandoned their interest in the duffel bag before the police opened it as part of the inventory of the contents of the car that one of the defendants was driving. The majority nevertheless affirms the suppression order because it concludes that the state failed to establish that defendants were not "prompted or coerced by illegal police conduct" to abandon their interest in the bag. 170 Or App at 448-51.

I believe that the majority errs in concluding that defendants abandoned their interest in the bag. The majority relies for its decision on cases that have distinguished between abandonment of property under Article I, section 9, of the Oregon Constitution and abandonment under property law. *See id.* at 446-48. I explained in my dissent in *State v. Cook*, 163 Or App 24, 34, 986 P2d 1228 (1999), *rev allowed* 330 Or 138 (2000), the difficulties that I have with that distinction. I believe that our use of it causes us to lose sight of the two fundamental issues that these cases commonly present. Those issues are (1) whether the defendant, in fact, has a possessory or ownership interest in the property that entitles her to object to the state's intrusion into that interest and (2) whether the state had lawful authority to intrude into that interest.[1] Statements in which a defendant disclaims an interest in property or acts in a way that subjects the property to scrutiny can bear on both issues, but it is important to distinguish between the two issues in assessing the significance of the statements or actions.

The following hypothetical illustrates my point. Assume that a homeowner is standing on the sidewalk outside her house at 2 a.m. on a cold and rainy winter morning. The front door to the house is wide open and an alarm is

---

[1] For these purposes, lawful authority means authority that has been given to the officer that is consistent with the constraints imposed by the state and federal constitutions on the grant or exercise of that authority.

reverberating from inside the house. A police officer drives by in a marked police car, stops next to the owner and asks if the house is the owner's. The owner says that it is not and that she knows nothing about it. The officer gets out of the car, goes to the door, and, after getting no response to rings of the doorbell, knocks on the door, and calls to occupants, walks into the house to look for people and the source of the alarm. As the officer walks through the house, she discovers marijuana plants, which she seizes. The officer subsequently determines that the person on the sidewalk is the owner and sole occupant of the house, so the officer arrests her for possession of the marijuana.

In the course of the prosecution of that charge, the defendant moves to suppress the marijuana found by the officer. Consistent with its decision in this case, the majority presumably would conclude that the statement that the defendant had made to the officer about the house would lead it to conclude that the defendant had "abandoned" her Article I, section 9, privacy interest in her home. *See* 170 Or App at 446-48.

I believe that the proper course is to consider the statement in relation to the two discrete issues that I have identified: whether the defendant has an interest in the house and whether the police officer had lawful authority to intrude into that interest. From that perspective, the statement does not establish that the defendant abandoned any property or privacy interest in the house, but it could be understood to give the officer legal authority to enter the house.

The first of the two issues that I have identified is purely a factual one. The defendant's statement about her interest in the house is evidence that a court could use to determine whether the defendant, in fact, had an interest in it. If the defendant presented undisputed evidence that established her ownership and sole occupancy of the house, the court presumably could not be persuaded that the statement established that she did *not* have those interests. Consequently, she would be someone who could seek suppression

of the marijuana notwithstanding her statement to the officer about her connection with the house, because she is someone who, in fact, had an ownership and possessory interest in the house when the officer entered it. *See, e.g., State v. Morton*, 326 Or 466, 469-70, 953 P2d 374 (1998).

The second issue, the officer's authority to enter the house, presents both factual and legal issues. If the court found that the officer believed the defendant's statement about her interest in the house and entered the house to protect the house and to provide aid to anyone inside it, the court could conclude that the officer had authority under ORS 133.033 to enter the house to perform a community caretaker function. The statement would bear on whether the officer reasonably believed that she needed to enter the house for that purpose and, hence, whether the entry was lawful and did not violate Article I, section 9, but it would not establish that the defendant had "abandoned" her interest in being free from a state intrusion into the house.[2]

The introduction of variations to the hypothetical should sharpen the point. Assume that, unbeknownst to the defendant, the officer knows that the defendant owns and is the sole occupant of the house. The officer stops her police car and asks about the open door and alarm. The defendant makes the same statement as before: that she doesn't live in the house and knows nothing about it. The officer says nothing further to the defendant and walks into the house to look through it. Nothing in the revised hypothetical affects the resolution of the first issue, which is whether the defendant has an interest in the house. As to the second issue, the statement still should not be viewed as establishing that the defendant had abandoned her interest under Article I, section 9, to be free from police intrusion into her property.

---

[2] The only other issue on which the statement might bear is whether the defendant had waived her right to be free from such an intrusion. The use of abandonment as a concept in this setting rather than waiver has the effect of creating a waiver without requiring the state to establish the prerequisites for it and without requiring courts to analyze the statement in relation to it. Although I question whether the statements and actions on which we have relied to conclude that a defendant had abandoned a privacy interest under Article I, section 9, would constitute a waiver and, hence, whether it serves any purpose to apply waiver principles to those statements and actions, waiver at least would be a legitimate principle to apply in the cases. Abandonment in the form that we apply it is not.

Rather, the statement should be understood to bear on whether it gave the officer lawful authority to enter the house. A claim by the officer that she had entered the house to fulfill a community caretaker function would be undercut by the officer's knowledge that the homeowner was standing outside the house and had said nothing about any threat to the house or its contents. That might not prevent the court from concluding that the officer had acted in accordance with her obligation to fulfill her community caretaker function, but the court would have to analyze the issue in terms of the officer's authority to act on that obligation, not in terms of whether the defendant had abandoned her interest in the house.[3]

Assume in a final variation that the defendant responds to the officer's inquiry by saying that it is her house, that a smoke alarm went off because she had burned some cookies that she was baking for work the next day, and that the door was open to air out the house. Assume further that the officer mistakenly believes that someone else owns and lives in the house and therefore concludes that the person with whom the officer is speaking had something to do with harming the person in the house and that the defendant is trying to avoid having the officer discover it. The officer directs the suspect to accompany her into the house, proceeds to walk through it, and, as a result, discovers the marijuana.

Obviously, in deciding the motion to suppress, the defendant's statement would not support an argument that she had abandoned a property interest in the house. I believe

---

[3] Of course, the officer's position would be improved if the officer told the defendant before entering the house that she knew that the defendant owned the house and was its sole occupant and that the officer was concerned about the open door and the alarm and with the defendant's denial of an interest in the house, and the defendant responded with another denial of knowledge about the house. That might reasonably lead the officer to question the defendant's mental state and to conclude that providing appropriate aid required the officer to enter the house to determine whether something in the house had caused the defendant's condition or to determine whether something in the house presented a serious danger to the defendant or the house and its contents. I assume, for these purposes, that the standard to be used to determine whether the officer acted lawfully in entering the house on that basis is whether she believed that she had to enter it to prevent serious harm or render aid to the defendant or someone else or to protect the house and its contents from serious harm, *see* ORS 133.033, and whether her beliefs were objectively reasonable. *See id.*

that it should be equally obvious that the statement should be analyzed in the same way that the first statement should be analyzed, which is to consider its effect on the two issues presented by these cases: whether the defendant had a relevant interest in the property and whether the officer had lawful authority to intrude into that interest. In all of the hypothetical variations, the defendant's statements should be analyzed in terms of their effect on the officer's authority to enter the house, not in terms of whether they establish that the defendant had abandoned her property interest in the house.[4]

Applying the foregoing principles to this case, it is readily apparent, as the majority recognizes, *see* 170 Or App at 446, that defendants' statements about the duffel bag have no bearing on whether they had a relevant interest in the bag. It should be equally apparent that they have no bearing on the officer's authority to open it. The officer opened the bag pursuant to the City of Medford policy that authorizes police officers to impound the vehicles of those driving with suspended licenses and to inventory the contents of lawfully impounded vehicles. Defendants' statements add nothing to the officer's authority to conduct that inventory, because the statements had no bearing on whether the bag would or could be inventoried or opened pursuant to the inventory policy. Furthermore, whether the statements were true or false, they are irrelevant to anything that the officer did with the bag. Consequently, they provide no support for the state's claim that the officer had lawful authority to open the bag, which is the second of the two issues that must be resolved in order to uphold the officer's examination of the bag's contents. As the majority correctly points out, the officer had no lawful authority to open the bag. It follows, therefore, that the officer violated Article I, section 9, by opening the bag, that defendants can challenge the lawfulness of the officer's conduct in doing that, and that the trial court did not err by

---

[4] To the extent that abandonment has a role to play in these cases, it is the abandonment that is recognized under property law. That form of abandonment gives people, including police officers, the authority to deal with property without requiring the people to consider the interests of the former owner. In other words, that form of abandonment properly bears on both the existence of the defendant's interest in the property and the officer's authority to seize and examine it.

granting defendants' motion to suppress. It is unfortunate that the majority relies on abandonment to reach the correct result in this case, because it continues to direct litigants and trial courts away from the issues that these cases properly present. However, the majority reaches the right result, so I concur in its disposition of the case.