Argued and submitted March 30, convictions in Case No. A121810 for delivery of controlled substance and possession of controlled substance reversed and remanded; convictions in Case Nos. A121811 and A121812 affirmed August 15, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTIAN CAPRAR,
aka Cristian Caprar,
*Defendant-Appellant.*

Multnomah County Circuit Court
0204-32579, 0207-33904, 0211-36991;
A121810 (Control), A121811, A121812

166 P3d 567

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the opening brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services. On the reply brief was Ingrid Swenson, Executive Director.

Anna Marie Joyce argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Carson, Senior Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant was convicted of various crimes in three different cases, which were consolidated for this appeal. Defendant challenges only his convictions in case number A121810 on one count of delivery of a controlled substance and on one count of possession of a controlled substance, *former* ORS 475.992 (2001), *renumbered as* ORS 475.840 (2005). He assigns as error the denial of his motion to suppress evidence seized during a consensual search, arguing that he was stopped unlawfully and that the police exploited the unlawful stop to obtain his consent to search. He also argues that he did not abandon a cracker box observed under an automobile, which contained drugs and an electronic scale. We reverse and remand for the reasons that follow.

The facts relevant to this appeal are undisputed. Officer Davis responded to an aborted 9-1-1 call from an apartment in Portland. She was familiar with the address because a neighbor had called several times before to report drug activity at the apartment. Officer Gray also responded to the scene as backup. When Davis arrived at the parking lot of the complex, she parked her patrol car behind a red car; defendant and a woman, Danilova, were standing near the red car. Gray parked her patrol car behind Davis's car, effectively blocking the entrance to the parking lot. Davis observed defendant to be "holding something in his hand which he set down behind the car." Davis testified that, at that time, "I did not look at what it was." The officers inquired whether either defendant or Danilova had called 9-1-1, and they responded that they had not made the call. Defendant said that he was visiting friends in the apartment. Davis then told them to stay with Gray while Davis proceeded to investigate the circumstances surrounding the 9-1-1 call. According to Davis, defendant and Danilova were not free to leave at that time.

Davis then proceeded to the apartment to investigate the call to 9-1-1. As a result, she discovered ongoing drug activity in the garage of the apartment that prompted the arrest of the apartment's occupant. Davis returned to the parking lot about 10 minutes later and spoke with defendant and Danilova. Davis asked defendant whether his visit to the

apartment had anything to do with the drug activity in the garage and whether he had any drugs in his possession or in the car. Defendant replied in the negative to both questions. Davis asked defendant if he would consent to a search of his person for drugs, and defendant consented. Gray searched defendant, finding a wallet containing $460, an additional $193 and some change in another pocket, multiple small zip-lock baggies, and a folded dollar bill that contained a white substance that tested positive for a controlled substance.

As a result of her search, Gray arrested defendant. She asked defendant what the baggies were for, and he replied, "Beads." Davis then walked up and asked Gray about the baggies, and Gray told her that they were for "[b]eads." At that point, Davis and Gray looked over near the red car and saw a Cheese Nips cracker box lying on its side underneath the car. Gray described its location as "about a foot and a half and two feet" under the car. As to the box's visibility to onlookers, Gray explained,

> "We pulled in behind the car, which would put the driver's side on the left-hand side, on the door side, so it [the cracker box] was under the driver's rear wheel area, but not underneath the wheel obviously, about a foot past the bumper where we would have seen it driving up because it's, you know, bright, multicolored. We would have seen it when we were driving up, but you wouldn't see it like if you were standing right on the back of the car there."

Gray added,

> "There was a clear box that looked like it could have had beads in it. It was inside the box. You could—you could look at it and there was a clear box inside of there that had like multi colors. I remember seeing something like that. And at that point I thought, 'Wow, maybe those are beads,' and so we picked up the box. And Officer Davis asked what was in the box. So I leaped over, I picked it up and I could see there was some sort of Tupperware container, that it was in the location that was lined, the clear box with items inside.

> "So I looked at the first clear box that I pulled out and it had a couple different colors in it, as I recall, and it turned out to be a scale. From my training/experience, this is the same type of scale used for measuring out baggies of drugs. And then I took a closer look at the Tupperware containers, and

through them I could see that there was a crystal substance that, in my training and experience again, looked to me to be—or appeared to be meth."

Davis also testified regarding the box:

"I asked Officer Gray, 'What's that?' and I pointed at it. And she picked up the box. Her eyes got very wide as she looked inside. And then she held the box open for me to see and I saw there was an electronic scale, which is what I thought was beads when I looked at it from a distance, and I could see Tupperware containers underneath that looked to be holding something that I suspected to be illegal drugs."

When asked by the officers, defendant denied ownership of the box and its contents. Danilova gave the officers permission to search the car, which belonged to her, and Gray found a black container that held a scale with white crystal residue on it.

Before trial, defendant moved to suppress all of the evidence seized by the officers. Defendant argued that he had been unlawfully stopped and that the officers exploited that illegality to obtain his consent to search. At the hearing on the motion, Davis testified that, when she told defendant and Danilova to stay with Gray, they were not free to leave, because she was not sure what was going on in the apartment, that someone could be dead or injured, and that she had "no idea" whether defendant had committed a crime. Davis also testified that, once she determined that the occupant's brother had called 9-1-1, defendant was free to leave. However, she did not tell defendant that he could leave before she asked for his consent to search him. The state acknowledged to the trial court that Davis's actions constituted a detention of defendant at a time when she did not have reasonable suspicion to believe that he had committed a crime. However, the state argued that the stop was valid under the community caretaking statute.[1] The state also

---

[1] ORS 133.033 provides, in part:

"(1) Except as otherwise expressly prohibited by law, any peace officer of this state, as defined in ORS 133.005, is authorized to perform community caretaking functions.

"(2) As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

argued that defendant had abandoned the cracker box when he put it under Danilova's car as the officers approached. The trial court denied the motion to suppress, ruling that defendant's detention was lawful under the community caretaking statute. After a jury trial, defendant was convicted. He appeals and assigns error to the denial of his motion to suppress.

■■ We review the denial of a motion to suppress for errors of law, and we are bound by the trial court's findings of historical facts as long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). When the trial court has made no factual findings, we presume that the court found the facts in a manner that is consistent with its ultimate conclusion. *State v. Ready*, 148 Or App 149, 153-54, 939 P2d 117, *rev den,* 326 Or 68 (1997).

■■ Defendant first argues on appeal that his detention was not authorized by the community caretaking statute because Davis stopped him for a criminal investigatory purpose. The state concedes on appeal that defendant's detention was not authorized under the community caretaking statute. We agree and accept the state's concession. The state argues, however, that the evidence gained from the search of defendant is admissible because the officers did not exploit the unlawful stop in order to obtain his consent to search. Defendant responds that, under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), he has established a minimal factual nexus between the unlawful stop and his consent to search and that the evidence must be suppressed because the police failed to prove that his consent was independent of the unlawful stop.

■ In *Hall*, the Supreme Court held that, to successfully suppress evidence found in a consensual search, a defendant must show "a minimal factual nexus between unlawful police

"(a)  The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A)  Prevent serious harm to any person or property;

"(B)  Render aid to injured or ill persons; or

"(C)  Locate missing persons."

conduct and the defendant's consent." *Id.* at 34-35. A "minimal factual nexus" is a "but for" relationship between the evidence sought to be suppressed and the prior unlawful police conduct. *Id.* at 25. Once the defendant has shown that nexus, however, the evidence may still be admissible if the state can "prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 35.

> "To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

*Id.* at 25 (citations omitted).

The above test requires a fact-specific inquiry into

> "the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* at 35 (footnote omitted).

Here, the "but for" factual nexus between the unlawful stop and defendant's consent is established by the fact that the police required defendant to remain at the scene while Davis investigated the 9-1-1 call. The state asserts, however,

"In this case, Officer Davis's request for defendant's consent was not the result of any inculpatory evidence that she found. As explained above, prior to her encounter with the apartment that night, Officer Davis already had an extensive history with the apartment, [the occupant], and reports of narcotic activity. Therefore, even before Officer Davis found drugs in the garage, she already knew that the apartment—and those connected to it—had been involved in drug activity."

The state also argues that there was a temporal break between the unlawful stop and Davis's request for consent to search, because, while Davis was investigating the 9-1-1 call, "defendant was not handcuffed, was free to walk around, and was not being questioned by police."

We disagree with both of the state's arguments. Davis's question to defendant was whether "his visit here today had anything to do with the drugs that I found in the garage." Her question was based primarily, if not entirely, on the evidence that she had found in the garage during her investigation and not on her knowledge of prior drug activity at the apartment. In addition, Davis testified that she told defendant and Danilova to remain in Gray's presence and that they were not free to leave at that point in time, because she was not sure what activities were occurring in the apartment. Although she testified that defendant was free to leave once she discovered the source of the 9-1-1 call, she did not communicate that understanding to defendant. Moreover, there are no intervening or mitigating circumstances that interrupt the causal connection between the stop and defendant's consent. Indeed, defendant was told by Davis "to stay with Officer Gray." In sum, because the state failed to prove that defendant's consent to search was independent of the unlawful police conduct, the evidence derivative of his consent should have been suppressed.

Defendant further argues that the evidence discovered in the cracker box should also have been suppressed because, in his view, the seizure and search of the box was also an exploitation of the illegal stop. In addition, he argues that he did not abandon his privacy interest in the box. The state responds initially that, although defendant preserved the claim that he did not "abandon" the box, he failed to preserve his claim that his privacy interests were violated when the officers looked into the box. We disagree.

At the hearing on the motion to suppress, defendant argued:

"The abandonment theory's a little more interesting, but I'm not sure this is a case where there's any sort of affirmative abandonment like tossing evidence out the car window when you're driving down the street. The evidence is that this was tucked in under a car, which the defendant had some connection to. And I'd submit that is not the same as tossing it across a parking lot and abandoning it. It didn't show any evidence [of] abandonment, to the contrary hiding behavior, if anything a ver[bal] disclaimer of an interest of property. [']Oh, officer, those aren't my drugs,['] *doesn't waive your protective* [sic] *privacy interest.*"

(Emphasis added.) We conclude that the above stated argument adequately preserved defendant's claim of error under ORAP 5.45, because the state was able to contest the issue and the trial court had the opportunity to rule on it.

The state next argues that defendant abandoned any possessory or privacy interest in the cracker box by unilaterally and voluntarily putting it under the car. Davis testified that, while she was in the process of contacting defendant, "[he] was holding something in his hand which he sat [sic] down behind the car." Gray testified that the location of the cracker box made it visible to others in the parking lot. She explained that "[w]e would have seen it when we were driving up, but you wouldn't see it like if you were standing right on the back of the car there." The state argues that the circumstances of this case are indistinguishable from the circumstances in *State v. Crandall*, 340 Or 645, 136 P3d 30 (2006), which was decided during the pendency of this appeal. In that case, a police officer told the defendant to

"stop" and "come here." Responding to the officer, the defendant walked toward him through a parking lot. However, he ducked down between two cars and put something underneath one of them before he approached the officer. Two other officers observed the defendant's actions and retrieved a clear plastic baggie that appeared to contain methamphetamine. Presuming that the stop was unlawful, the Supreme Court ruled that the question of whether the officers constitutionally could retrieve the baggie presented two separate issues. First, the court concluded that the officers had not engaged in a "search" for purposes of Article I, section 9, because any member of the public could have walked through the parking lot and observed a baggie with what appeared to be a controlled substance in it lying under a car and, therefore, the officers had not invaded defendant's privacy interest in the baggie. 340 Or at 649. Second, the court considered whether the evidence should have been suppressed because its discovery derived from or was the product of an unlawful stop. The court reasoned that, although the defendant put the baggie under the car as a result of the officer's summons, which established "but for" causation, the defendant's unilateral, voluntary decision to put the baggie underneath the car sufficiently attenuated the discovery of that evidence from the prior illegality. *Id.* at 652.

In *State v. Standish*, 197 Or App 96, 99-100, 104 P3d 624, *rev dismissed*, 339 Or 450 (2005), we summarized the principles governing abandonment of possessory and privacy interests:

"Article I, section 9, of the Oregon Constitution protects against state interference with people's possessory and privacy interests in their persons, houses, papers, and effects. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). It requires suppression of evidence that was obtained through a search that violated a defendant's rights. *State v. Tanner*, 304 Or 312, 315-16, 745 P2d 757 (1987). To obtain suppression, 'a defendant is not required to assert a protected property or privacy interest on which the state intruded. Rather, * * * the burden is on the state to prove that the warrantless search did *not* violate a protected interest of the defendant.' *State v. Tucker*, 330 Or 85, 88-89, 997 P2d 182 (2000) (emphasis in original). If a defendant has actual or constructive possession of property immediately before it is

searched, the defendant has a constitutionally protected possessory interest in that property. *State v. Morton*, 326 Or 466, 469-70, 953 P2d 374 (1998) (actual possession); *State v. Silva*, 170 Or App 440, 446, 13 P3d 143 (2000) (constructive possession). A defendant may abandon his constitutionally protected interest in the property by manifesting an intent to relinquish that interest. [*State v. Cook*, 332 Or 601, 608, 34 P3d 156 (2001)]. A defendant does not abandon a constitutionally protected interest if the words or conduct manifesting an intent to relinquish it were coerced by illegal police conduct. *Morton*, 326 Or at 470; *Silva*, 170 Or App at 448."

(Footnote omitted.)

We have also identified various factors that are relevant to whether a defendant manifested an intent to relinquish constitutionally protected interests in the property, including:

"(1) whether a defendant separated himself or herself from the property as a result of police instruction * * * or illegal police conduct * * *; (2) whether a defendant left the property on private, as opposed to public, property * * *; and (3) whether a defendant made any attempt to hide the property or in any other way manifest[ed] an intention to the police that he or she was attempting to maintain control over it[.]"

*State v. Stafford*, 184 Or App 674, 679, 57 P3d 598 (2002), *rev den*, 335 Or 181 (2003) (citations omitted).

■ Arguably, if defendant abandoned his privacy and possessory interests in the cracker box before his encounter with Davis and Gray turned into a detention during which Davis completed her investigation, the seizure and the subsequent search of the box may not be derivative of the unlawful detention. Rather, it could be derivative of defendant's act in placing the box under the car. The state argues on appeal that, if we conclude that the evidence of the contents of defendant's pockets are not admissible because the officers exploited an illegality, we should remand for a new trial based on the contents of the cracker box. However, the trial court did not make any findings regarding the issue of abandonment or rule on it as a matter of law. In order for this court to affirm a trial court's conclusion based on different

reasoning, the parties must have had an adequate opportunity to litigate the issue in the trial court. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). We have reviewed the record before us, and we are not persuaded that the requirements for affirming under the "right for the wrong reason" doctrine have been satisfied. We therefore make no ruling regarding whether defendant abandoned his privacy and possessory interests in the cracker box or whether the rule of *Crandall* governs the result in this case.

Convictions in Case No. A121810 for delivery of controlled substance and possession of controlled substance reversed and remanded; convictions in Case Nos. A121811 and A121812 affirmed.